**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:                                                           Chapter 11

IPS WORLDWIDE, LLC                                Case No. 6:19-bk-00511-KSJ

              Debtor.

_____/

**EMERGENCY MOTION OF CREDITOR STANLEY BLACK & DECKER, INC.
FOR ENTRY OF AN ORDER COMPELLING THE DEBTOR TO ASSUME OR
REJECT THE SERVICES AGREEMENT PURSUANT TO 11 U.S.C. § 365(D)(2)**

**[*EMERGENCY HEARING REQUESTED*]**

Creditor Stanley Black & Decker, Inc. ("**SBD**"), respectfully moves pursuant to 11 U.S.C. § 365(d)(2) and Fed. R. Bank. P. 6006(b) and 9014 for the entry of an order compelling the Debtor, IPS Worldwide, LLC (the "**Debtor**") to assume or reject the Services Agreement (as defined below) by and between SBD and the Debtor (the "**Motion**").  In support, SBD states as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor has served as SBD's primary freight payment processor since 2011, entrusted under the Services Agreement with the processing and payment of as many as 100,000 weekly U.S. freight invoices.  For at least the past two (2) months prior to the Petition Date (as defined below), the Debtor has failed to perform its obligations under the Services Agreement —specifically the payment of SBD's 360 domestic Freight Providers (as defined below) with the proceeds made available by Citibank, N.A. through

a funding mechanism whereby the Debtor sells its SBD receivable to Citibank, accelerating the receipt of the funds earmarked to pay SBD's domestic Freight Providers. While the extent of the financial loss remains unknown as a result of Debtor's failure and refusal to permit SBD to exercise its audit rights under the Services Agreement, the Debtor's own Petition commencing this Chapter 11 case reflects that more than **$41,000,000** of those proceeds may have been diverted by the Debtor and its principals to other unknown uses.[1]   As a result, SBD is exercising its right of recoupment, and withholding payment to the Debtor of transaction and administrative fees incurred post-petition.

2.       Reporting only $50,000 in assets against this staggering set of liabilities,[2] the Petition conclusively establishes that the Debtor is hopelessly insolvent and unable even to fulfill its ongoing obligations under the Services Agreement, much less reorganize in Chapter 11.   Meanwhile, in order to maintain its critical North American distribution network and ensure that products are timely shipped, SBD is required to make what amounts to double payments to its Freight Providers on the same invoices for which amounts previously were advanced to the Debtor under the Citibank arrangement.

3.       In light of the continuing risk of loss and disruption to its business posed by the circumstances referenced above and described more fully below, SBD respectfully requests that cause exists for the Court to enter an Order (a) directing the Debtor to file a

---

[1] The precise amount shown on the List of 20 Largest Creditors included with the Debtor's Voluntary Petition is $41,645,007.04, constituting the single largest of more than $119 million in general unsecured claims owed to those creditors.  ECF #1.

[2] It is far outside the ordinary course of business for the Debtor to have failed to pay over $41 million in Freight Provider invoices attributable to SBD, more than ⅓ of the more than $119 million in liabilities to the 20 Largest Creditors.

motion to assume or reject the Services Agreement (the **"365 Motion"**) within five (5) days from the entry of that Order, (b) scheduling a hearing on the 365 Motion on shortened and limited notice, not later than three (3) days from the filing of such Motion, and (c) providing further that in the event the Debtor fails to file the 365 Motion on a timely basis, the Services Agreement shall immediately be deemed rejected.

## BACKGROUND

### A.      The Services Agreement

4.      SBD is a leading global supplier of a wide range of tools and storage equipment, commercial electronic security systems, and industrial products.  SBD sells products internationally under iconic brand names such as Stanley®, Black + Decker®, DeWalt®, Craftsman®, Lenox®, Vidmar® and many others.  During the fiscal year 2017, SBD had total revenues in excess of $12 billion, generated mostly from the sale of products like those described above.

5.      In North America alone, SBD ships and receives enormous quantities of freight through a myriad of transportation companies such as United Parcel Service, Federal Express, Kuehne Nagel, Expeditors, and Estes, among many others (collectively, the "**Freight Providers**").  In total, SBD currently uses approximately 360 Freight Providers throughout North America, and is obligated to pay the Freight Providers for their services.

6.      In 2018, SBD made or received approximately 8.2 million shipments in North America — over 22,000 shipments per calendar day, for which more than 100,000

invoices are created each week — and spent over $300 million on its North American shipping needs.

7.   Debtor has been engaged in the business of providing freight payment services for SBD and other customers, many of whom are listed as among the 20 largest creditors to which the Debtor admits owing in excess of $119 million.   Among other things, Debtor claims to reduce its clients' transportation costs by approximately 7% to 9% by utilizing a proprietary technology platform and auditing system.   Among other things, on behalf of its customers Debtor undertakes to (a) ensure that freight bills are remitted by the shippers in accordance with contractual terms, (b) eliminate duplicate or improper charges of shippers, (c) resolve disputes with shipping companies, and (d) make timely carrier payments to shippers in the appropriate currencies (using funds provided by customers such as SBD).

8.   On May 26, 2011, SBD and Debtor entered into their initial contractual relationship concerning the processing and payment of SBD's shipping invoices in the United States and Canada.   As outlined below, the initial contract was replaced and superseded by a later and more complete agreement in 2013.

9.   On or about December 16, 2013, SBD and Debtor executed that certain Freight Bill Processing Services Agreement ("**Services Agreement**"), a copy of which is attached hereto as **Exhibit A**.   The Services Agreement is the document currently controlling the parties' business relationship.

10.   To effectuate a change in the pricing structure that existed under the Services Agreement, the parties on or about February 1, 2018 executed that certain

Addendum to Freight Bill Processing Services Agreement Effective 2/01/2018 ("**Addendum**"), a copy of which is attached hereto as **Exhibit B**. Unless otherwise stated, the Services Agreement and the Addendum are hereinafter collectively referred to as the "Services Agreement."

11.     To enable the Debtor to process and pay the invoices of its Freight Providers, SBD entrusted Debtor with significant quantities of proprietary, sensitive and confidential business information. This information included, without limitation, (a) master shipping contracts between SBD and the Freight Providers, setting forth the amounts owed to the Freight Providers for various shipping services, and the terms of payment (the "**Master Shipping Contracts**"); (b) SBD's bank account and other sensitive financial information; and (c) "location codes" and "business codes" within the SBD organization that enable Debtor to allocate shipping charges to approximately 40 different business units within that organization. In short, SBD entrusted Debtor with virtually every piece of business information – much of which is highly confidential – necessary for Debtor to perform its North America freight payment services on behalf of SBD.

12.     The Freight Providers were placed in Debtor's computer system, a process that took roughly 18 months to complete. Since then, the Freight Providers transfer to Debtor – often in electronic format and on a weekly or on other regular periodic basis – the freight invoices that are due to be paid on behalf of SBD.

13.     Debtor audits the incoming freight invoices to ensure their accuracy, their compliance with the Master Shipping Contracts, and their eligibility to be paid. Once the

freight invoices are reviewed, audited and approved, Debtor then facilitates payment of same.

14.    To facilitate those payments, Citibank then wires to Debtor the funds necessary to pay the approved freight invoices.  The funds advanced to Debtor by Citibank are intended to be used for the exclusive purpose of paying only SBD's Freight Providers when an invoice is due and owing (hereinafter the "**Earmarked Funds**").  At times, and indeed rather frequently, the Earmarked Funds in the possession of Debtor – to be used solely for the benefit of SBD – exceeded $30 million.

15.    In essence, under the Services Agreement SBD contractually outsourced to the Debtor this facet of its business, and entrusted the Debtor with the confidential data and information necessary to conduct that business.  Over time, SBD relied upon the Debtor to process and pay the shipping invoices of the Freight Providers on a timely and accurate basis.  In reliance upon the Debtor's performance of the freight payment function on its behalf – for which Debtor was being compensated – SBD did not maintain duplicative personnel or payment systems to handle the outsourced function.

16.    During the second quarter of calendar 2018, SBD became concerned about its reliance on the Debtor to provide this array of services, and specifically that the volume of business flowing to the Debtor under the Services Agreement was beyond its capacity to handle.  As a result, beginning on June 4, 2018 SBD notified the Debtor's representatives of its intention to begin what would be a slow and complicated transition of a portion of its shipping and logistics business to another provider, as it was permitted

under the non-exclusive terms of the Services Agreement to do.  That transition process

continues to this day.

**B.        The Debtor's Breaches of the Services Agreement**

17.      In December 2018, SBD began receiving an increasing number of

questions from certain Freight Providers regarding the status of payments that were owed

to them for their freight services, many of which were overdue.  When SBD approached

the Debtor's representatives regarding the failure to make the required payments, the

Debtor provided a myriad of complicated stories but could not offer any clear,

satisfactory or credible explanations.

18.      On January 3, 2019, two of SBD's representatives traveled to Ormond

Beach to meet with Debtor's team to address the existing payment issues.  Although

these meetings were held over several days, certain of Debtor's employees simply failed

to appear for the scheduled discussions.  Accordingly, the parties could not reconcile or

resolve all of the Freight Provider delinquencies.

19.      On January 14, 2019, another envoy of SBD representatives traveled to

Ormond Beach to meet again with Debtor's team.  Once again, the Debtor provided no

clear answers to SBD's questions.  During the course of that meeting, SBD formally

scheduled a personal meeting for January 17, 2019 between one of its senior executives

and William G. Davies, the President and founder of Debtor, who coincidentally signed

both the Services Agreement and the Petition on behalf of the Debtor.

20.      With no prior warning or advisory, Mr. Davies unexpectedly failed to

appear for the January 17 meeting.  Instead, Michael McNett, Debtor's Chief Financial

Officer, appeared at the meeting on behalf of Debtor.  Like others before him, Mr. McNett was (again) unable to answer SBD's questions credibly or reasonably.  Further, Mr. McNett purported to be unable to access the balance of available funds that the Debtor was then holding for SBD, and generally conducted himself in an odd and evasive manner.

21.     On January 18, 2019, the day after Mr. Davies failed to appear at the scheduled meeting and Mr. McNett was supposedly unable to show SBD the balance of available funds, SBD notified Debtor in writing of the occurrence of a material breach of the Services Agreement (the "**Default Notice**").  A true and correct copy of the Default Notice is attached hereto as **Exhibit C**.

22.     Among other things, the Default Notice asserted that at least $11,000,000 to be paid by Debtor to the Freight Providers was past due.  In the same writing, SBD provided to Debtor the formal written notice required by Section 23 of the Services Agreement, and scheduled an on-site audit contemplated by Section 22 of the Services Agreement at Debtor's business for 1:00 p.m. on Tuesday, January 22, 2019.  The time and date of the on-site audit was later discussed with and expressly agreed to by the Debtor.

23.     In reliance on the Default Notice, discussion and agreement referenced in the immediately preceding paragraph, SBD sent various representatives to Ormond Beach to conduct the on-site audit on January 22, 2019.

24.     Less than two (2) hours before the scheduled audit was to begin, Debtor's counsel wrote to SBD and purported to cancel the audit (the "**Interference Letter**").   A true and correct copy of the Interference Letter is attached hereto as **Exhibit D**.

25.     The excuses provided in the Interference Letter were illegitimate and pretextual, and are not recognized grounds upon which the audit could properly be refused.   Even so, the Interference Letter admits a "recent resignation" of a "key employee" of the Debtor, which resignation amplifies SBD's concerns about the status and whereabouts of the Earmarked Funds.

26.     On January 22, 2019, counsel for SBD responded to the Interference Letter, and, among other things, (a) asserted that the purported cancellation of the audit was improper; and (b) requested the identity of the "key employee" referenced in the immediately preceding paragraph.  A true and correct copy of this written communication is attached hereto as **Exhibit E**.

27.     On January 23, 2019, counsel for Debtor responded to **Exhibit E**.  A true and correct copy of this response is attached hereto as **Exhibit F**.  In **Exhibit F**, counsel for Debtor indicated that Brandy Peterson is the "key employee" who "recently resigned" from Debtor's business.  In reality, Ms. Peterson inexplicably resigned from Debtor's employ back on January 11, 2019, during the time that SBD was attempting amicably to ascertain the facts behind the vendor delinquencies and the status of the Earmarked Funds.

28.     At approximately 7:40 a.m. on January 23, 2019, counsel for SBD and Debtor spoke by telephone.  Following the call, counsel for SBD sent to counsel for

Debtor the confirming email attached hereto as **Exhibit G**.  At no time did Debtor's counsel dispute or repudiate any of the matters set forth in **Exhibit G**.

29.     Upon information and belief, and as clearly suggested by the reference to the $41 million owed to SBD as an unsecured claim in the Debtor's List of 20 Largest Creditors, Debtor diverted, stole or otherwise misappropriated millions of dollars of the Earmarked Funds that properly belong to SBD.

30.     Rather than timely and fully disclose to SBD that millions of dollars of the Earmarked Funds had been diverted, stolen or otherwise misappropriated over an undetermined period dating back at least to December of 2018 when Freight Providers first alerted SBD to the nonpayment of their invoices, Debtor and its agents embarked on a dilatory scheme to conceal the misconduct.  While SBD was engaged in good faith efforts to ascertain the status of its account and of the Earmarked Funds, Debtor and its agents refused to provide the information requested and continued to cover up their own prior intentional misdeeds.

B.      **The Debtor's Bankruptcy Filing and Continued Breach of the Services Agreement**

31.     On January 25, 2019 (the "**Petition Date**"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Petition**") in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

32.     The Debtor, as a debtor-in-possession, continues to conduct its business operations pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

33.     Notwithstanding the Default Notice and SBD's repeated requests to access its shipping and banking information through the audit procedures in the Services

Agreement, the Debtor continues to breach the Services Agreement by, without limitation, its (i) continued refusal to allow SBD to perform the audit, or even to provide access to the documents, data and information from which SBD could begin to perform such an audit, (ii) failure to pay Freight Providers for the shipments that have already occurred, (iii) failure to perform the obligations under the Services Agreement on a timely basis, and (iv) failure to provide information regarding Earmarked Funds.[3]

## LEGAL ARGUMENT

34.     SBD moves to compel the Debtor to file a 365 Motion to assume or reject the Services Agreement within five (5) days of entry of an order approving this Motion. If the Debtor elects to assume the Services Agreement, such assumption must be founded upon strict compliance with the provisions of section 365(b)(1) of the Bankruptcy Code, requiring that the Debtor (A) cure, or provide adequate assurance that it will promptly cure, its numerous defaults under the Services Agreement, (B) compensate, or provide adequate assurance that it will promptly compensate, SBD for its actual pecuniary loss resulting from such defaults, up to or in excess of the $41 million amount reflected on the List of 20 Largest Creditors, and (C) provide adequate assurance of future performance under the Services Agreement.  Failing strict compliance by the Debtor with these statutorily mandated conditions precedent to assumption, the Court should deem the Services Agreement immediately rejected.

---

[3]    SBD is separately filing a Notice of Examination seeking the production of these documents and information under Bankruptcy Rule 2004, and a motion to shorten time for production.  Even the immediate furnishing of all the requested documents and data, however, does not negate or alter the emergency basis upon which Debtor must be required to assume or reject the Services Agreement.

A.    **The Court Should Compel the Assumption or Rejection of the Services Agreement.**

35.    The Debtor should immediately be compelled to assume or reject the Services Agreement.  Bankruptcy Code Section 365(d)(2) provides:

> the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. §365(d)(2).   A motion seeking to compel assumption or rejection under Bankruptcy Rule 6006(b) is a contested matter governed by Rule 9014.  Fed. R. Bank. P. 6006(b).

36.    The bankruptcy court has broad discretion in determining whether to shorten the period for assumption or rejection of an executory contract.  *See In re Travelot Co.*, 286 B.R. 462, 466 (Bankr. S.D. Ga. 2002) (bankruptcy court is empowered with discretion to establish an earlier deadline for an assumption/rejection decision); *In re Monroe Well Serv., Inc.*, 83 B.R. 317, 323 (Bankr. E.D. Pa. 1998) ("whether to shorten the time period, (and by how much) is a matter left to the broad discretion of the bankruptcy court.").

37.    In deciding whether to accelerate the debtor's decision to assume or reject an executory contract, the court must balance the interests of the contracting party against the interests of the debtor and its estate.  *See In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001).   Courts consider a number of factors when determining whether to establish an earlier deadline, including (i) the nature of the interests at stake;

(ii) the balance of the harm to the litigants; (iii) the good to be achieved; (iv) the safeguards afforded those litigants; and (v) whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary. *See In re G-I Holdings, Inc.*, 308 B.R. 196, 213 (Bankr. D.N.J. 2004).

38.    The balancing of these factors weighs in favor of requiring the Debtor promptly to assume or reject the Services Agreement.  As mentioned, under that Agreement the Debtor is responsible to oversee the payment of the majority of SBD's North American freight shipments (processing approximately 100,000 invoices weekly), and had access to tens of millions of dollars of Earmarked Funds.  Those Earmarked Funds were not used to pay SBD's Freight Providers, who are now demanding payment directly from SBD to continue delivering its products.  As a direct result of the Debtor's non-performance and associated misdeeds, SBD already has paid **$22.5 million** to Freight Providers (amounting to double-payment of those invoices because the funds to pay those invoices had previously been advanced to the Debtor).  This double-payment was necessary because those Freight Providers' accounts had become so delinquent due to the Debtor's failure to pay their invoices that the Freight Providers were threatening to stop shipping SBD's products.  Moreover, without access to the shipping and payment information in the Debtor's possession, SBD is unable to determine which Freight Providers have been paid, the amounts still owed, and the extent of the misappropriation of funds by the Debtor.

39.     The Debtor refuses to provide the required information, comply with other terms of the Services Agreement, and is unwilling to cure its ongoing non-monetary defaults.

40.     The Debtor's multiple defaults and inability to perform its obligations under the Services Agreement threaten to disrupt SBD's distribution chain and cause harm to its critical relationships with hundreds of its Freight Providers.  Absent immediate cure, compensation and adequate assurance of future performance under section 365(b), Debtor must be compelled to reject the Services Agreement and thereby relieve SBD of any ongoing obligations thereunder.

41.     As a result of the Debtor's repeated failure to comply with the terms of the Services Agreement and the other circumstances described above, cause exists for the Court to compel the assumption or rejection of the Services Agreement as sought herein. In the event the Debtor is unable to comply with Section 365(b)(1) by curing its substantial defaults and providing adequate assurance of future performance, the Services Agreement should immediately be deemed rejected.

**B.     The Debtor Cannot Satisfy Section 365(b)(1) and Should, Therefore, Be Compelled to Reject the Services Agreement Immediately.**

42.     The Debtor's conduct before and during this bankruptcy case militates against a finding that it now can satisfy the strict and clear requirements of Sections 365(b)(1).  In addition to the requirement that a debtor seeking to assume an executory contract must cure all defaults and compensate SBD for its actual pecuniary loss believed to be in the tens of millions of dollars, the Debtor must also provide adequate assurance of future performance in accordance with Section 365(b)(1)(C).

43.    The Debtor admitted in its Petition that it has $50,000 in assets and owes

SBD in excess of $41 million, and has displayed an obstinate unwillingness to cure non-

monetary defaults that are continuing post-petition.   Moreover, while SBD was only

alerted to the Debtor's failure to pay the Freight Providers in December of 2018, upon

information and belief the diversion of Earmarked Funds to other uses has been occurring

for much longer.   As a result of its failure to comply with the Services Agreement, its

extremely limited cash position as referenced by the statement in its Petition that it has

assets of only $50,000, and SBD's withholding of ongoing payments in recoupment of a

portion of the pre-petition indebtedness,[4] the Debtor cannot possibly cure, compensate

and provide the required adequate assurance of future performance under section 365(b)

of the Bankruptcy Code.

---

[4] Courts within the Eleventh Circuit have recognized the equitable doctrine of recoupment. *See In re Smith,* 737 F.2d 1549, 1553 (11th Cir. 1984); *In re Affiliated of Fla., Inc.,* 258 B.R. 495, 501 (Bankr. M.D. Fla. 2000) (recognizing that recoupment is "the satisfaction of an obligation by crediting against it a reciprocal obligation arising from the same transaction").   While often merged with its sister right of setoff in other contexts, the common law doctrine of recoupment is a separate and distinct doctrine in bankruptcy.   Recoupment "allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim." *Akincibasi v. Moscaritolo (In re Akincibasi),* 372 B.R. 80, 84 (Bankr. M.D. Fla. 2007) (quoting *In re Holford,* 896 F.2d 176, 178 (5th Cir. 1990)).   "Unlike setoff, which allows a creditor to offset a pre-petition debt with a mutual pre-petition debt, recoupment transcends the filing of a petition and allows a creditor to offset a pre-petition debt with a mutual post-petition debt." *Barrett v. Barrett (In re Barrett)*, 410 B.R. 113, 122 (Bankr. S.D. Fla. 2009).   Further, exercise of the right of recoupment is not affected by the automatic stay. *In re Affiliated of Florida, Inc.*, 258 B.R. at 499 (Bankr. M.D. Fla. 2000) ("[R]ecoupment is an equitable, nonstatutory exception to the automatic stay . . . ."); *In re Graves,* 234 B.R.149, 150 (Bankr. M.D. Fla. 1999) (finding recoupment is not subject to the automatic stay).

WHEREFORE, SBD moves on an emergency basis for the entry of an order (i) directing the Debtor to file the 365 Motion within five (5) days from the entry of that Order, (ii) scheduling a hearing on the 365 Motion on shortened and limited notice, not later than three (3) days from the filing of such Motion, (iii) providing further that in the event the Debtor fails to file the 365 Motion on a timely basis, the Services Agreement shall immediately be deemed rejected, and (iv) granting such other relief as may be just and proper.

Dated: January 30, 2019

Respectfully submitted,

GREENBERG TRAURIG, P.A.
Bank of America Plaza
101 E. Kennedy Blvd., Suite 1900
Tampa, FL 33602-5148
Telephone: 813.318.5700
Facsimile: 813.318.5900


By: /s/ Danielle S. Kemp
Danielle S. Kemp, Esq.
Florida Bar No. 474355
Email: kempd@gtlaw.com

- and –

I. William Spivey II, Esq.
Florida Bar No. 701076
email: spiveyw@gtlaw.com
450 South Orange Avenue
Suite 650
Orlando, FL 33131
Telephone: 407.420.1000
Facsimile: 407.420.5909

-and-

Mark D. Bloom
Florida Bar No. 303836
email: bloomm@gtlaw.com
333 SE 2nd Avenue
Miami, FL 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Attorneys for Stanley Black &
Decker, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or *pro se* parties who are authorized to receive electronically Notices of Electronic Filing in this bankruptcy case.

/s/ Danielle S. Kemp
Danielle S. Kemp, Esq.

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

Audrey M Aleskovsky on behalf of U.S. Trustee United States Trustee - ORL
Audrey.M.Aleskovsky@usdoj.gov

Mark D Bloom on behalf of Creditor Stanley Black & Decker, Inc.
bloomm@gtlaw.com, mialitdock@gtlaw.com;miaecfbky@gtlaw.com

Danielle S Kemp on behalf of Creditor Stanley Black & Decker, Inc.
kempd@gtlaw.com, muehlfeldern@gtlaw.com;tpalitdock@gtlaw.com

Kenneth G M Mather on behalf of Creditor Resource Logistics Group, Inc.
kmather@gunster.com, tkennedy@gunster.com;mweaver@gunster.com

Scott W Spradley on behalf of Debtor IPS Worldwide, LLC
scott@flaglerbeachlaw.com, suzy@flaglerbeachlaw.com;danielle@flaglerbeachlaw.com

United States Trustee - ORL
USTP.Region21.OR.ECF@usdoj.gov

## Manual Notice List

The following is the list of **parties** who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service).

(No manual recipients)