UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

IPS Worldwide, LLC,                                             Case No.:   6:19-bk-00511-KSJ
                                                                Chapter 11

              Debtor.
_____/

### UNITED STATES TRUSTEE'S
### MOTION TO APPOINT A CHAPTER 11 TRUSTEE
### OR, IN THE ALTERNATIVE, CONVERT THIS CASE TO CHAPTER 7

**Preliminary Hearing: April 5, 2019 at 11 a.m.**

The United States Trustee for Region 21, Daniel M. McDermott ("UST"), by and through his undersigned counsel, moves this Court to enter an order directing the appointment of a chapter 11 trustee over the estate of the debtor, IPS Worldwide, LLC ("Debtor"), or in the alternative, to convert to case to one under chapter 7.  In support, the UST states as follows:

### I.  STANDING

1.      The UST has standing to file motions to dismiss or convert chapter 11 cases, and to seek the appointment of a Chapter 11 trustee, under 11 U.S.C. §§ 307, 1104(a), 1104(c) and 1112(b)(1), as well as 28 U.S.C. § 586.  *See also* Collier on Bankruptcy ¶ 1112.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

### II.  BACKGROUND

2.      On January 25, 2019, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (Doc. No. 1; "Original Petition") signed by Mr. William Davies ("Davies") as President of the Debtor.

1

3.      The Original Petition reflects that the Debtor has estimated assets of less than $50,000.00 and estimated liabilities between $100 million to $500 million. (Doc. No. 1 at 3.) Filed with the Original Petition, the Debtor's List of 20 Largest Unsecured Creditors (Doc. No. 1 at 5-6) indicates total debt in the amount of $121,174,321.70 held by these creditors.[1]

4.      According to the Amended Case Management Summary (Doc. No. 101) filed on February 11, 2019, Davies is the President and sole member of the Debtor.[2] The Debtor is a Florida Limited Liability Company formed in Ormond Beach, Florida in 1998 by its founder, Davies. The Debtor operates as a freight audit and payment solutions business, with recent annual revenue of approximately $8 million. The Debtor currently has offices in seven countries, covering North America, Europe, Asia and Latin America.

5.      The Debtor continues to operate its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On February 6, 2019, the UST filed an Emergency Unopposed Motion to Appoint a Chapter 11 Examiner (Doc. No. 56), which was granted by this Court on February 14, 2019 (Doc. No. 124). The UST filed a Notice of Appointment of Chapter 11 Examiner (Doc. No. 125) selecting Maria M. Yip as the Examiner in this case.

---

[1] On January 30, 2019, the Debtor filed an amended petition (Doc. No. 23) to remove the estimated assets and liabilities, leaving these sections blank. (Doc. No. 23 at 3.) On February 11, 2019, the Debtor filed an Amended List of 20 Largest Unsecured Creditors (Doc. No. 103) indicating total debt in the amount of $51,656,126.77 held by these creditors.

[2] However, the Debtor's Amended Statement of Financial Affairs (Doc. No. 152 at 15) and Davies' testimony at the First Meeting indicate that he owns 66% of the Debtor, Michael McNett ("M. McNett") owns 22%, and Jacque McNett ("J. McNett") owns 11%.

7.  On February 14, 2019, the UST filed an Application to Approve Appointment of Chapter 11 Examiner (Doc. No. 127), which was approved in the Court's Supplemental Order Regarding the Appointment of Chapter 11 Examiner (Doc. No. 143) entered on February 20, 2019.

8.  On February 15, 2019, the UST filed a Notice of Appointment of Creditors' Committee (Doc. No. 130) which was amended on February 19, 2019 (Doc. No. 135).

9.  On February 25, 2019, the UST conducted the first meeting of creditors ("First Meeting"), at which Davies testified on behalf of the Debtor. Davies' testimony included the following:

   a.  Davies does not know why the customers' bank accounts were set up the way they currently are – some comingled and others segregated. He stated that the Debtor previously operated "one big bank account" until "the finance or the accounting department . . . over the last year or so, started opening up all these accounts." (First Meeting Trans. at 58, Lines 11-25; *Id*. at 69, Lines 20-22; *Id*. at 86-87.)

   b.  The Debtor started struggling to keep up with remitting freight payments on behalf of customers "for some months now, maybe more than a year even, actually."[3]

   c.  Davies stated that he had no idea why the shortfall, that appears to be tens of millions of dollars, had accrued. (*Id*. at 85, Lines 9-12.)

   d.  Davies was not aware that the 2017 tax return for the Debtor had not been filed. (*Id*. at 61, Lines 9-11.)

---

[3] During the two-year period prior to the Debtor's bankruptcy filing, Davies received compensation of $515,000 as President, M. McNett received compensation of $427,000 as Chief Financial Officer, and J. McNett received compensation of $420,000 as Vice President. (Examiner's Interim Report ¶ 131.)

3

  e. Davies does not know why the Debtor's former Director of Accounting, Brandy Peterson, suddenly resigned from her position shortly before the Petition Date. Davies stated that she was the only person in the whole company who had passwords to the accounts and that he had never spoken to her. (*Id*. at 70-71.)

  f. Davies offered inconsistent explanations of the ownership structure involving the Debtor and affiliated and/or subsidiary entities of the Debtor, including Dacaco Holdings, LLC; IPS Brussels; ExFreight Zeta, LLC; DCC Management Company, LLC; and DMM Services, LLC. (*Id*. at 20-39; 59-60.)

  g. Davies stated that he was in charge of Freight Audit and Payment Solutions division—the main function of the Debtor's operation. (*Id*. at 16, Lines 9-11.) Yet, he also stated that he had no involvement with payments or approving payments. (*Id*. at 65-66.)

  h. When asked about the Debtor's post-petition operations, Davies stated that he did not know if any money was coming in from current clients or if any money had been going out. (*Id*. at 68, Lines 17-25.)

10. Due to Davies' lack of familiarity with the Debtor's bank accounts, financial records, and customer transactions, the meeting was continued to March 18, 2019 to allow the Debtor's Chief Financial Officer, M. McNett, to provide testimony.

11. On March 6, 2019, Maria M. Yip, Chapter 11 Examiner, filed an Interim Report (Doc. No. 182; "Examiner's Interim Report"). At a hearing on March 7, 2019, the Examiner presented a summary of her initial findings to the Court, which included the following observations:

      a.    "The Debtor really does not have internally a strong accounting group that could help it deal with some of the volume that it does." (Hearing Trans. at 30, Lines 5-8.)

      b.    "Without a doubt one of the – what has happened in this case is that there's been a significant amount of commingling of money." (*Id*. at 36, Lines 1-3.) "It is not that in every instance when money came in . . . from one customer that it was in fact being used to pay another customer's freight bill. These are -– I'm not going to describe them as anomalies . . . they're frequent and they're inappropriate."[4] (*Id*. at 36, Lines 13-18.)

      c.    "I looked at retainers that were paid out right around the time of the bankruptcy filing. The one that concerns me the most, Your Honor, is at page 38 and paragraph 133, and that is a retainer to the law firm of Delgado and [Romanik]. It was made in two payments; one for [$]10,000 and then on the day of the petition one for [$]150,000." (*Id*. at 40, Line 15-21.)[5]

---

[4] The Examiner's Interim Report states that there are contracts between the Debtor and its customers that contain clauses that prohibit the Debtor from commingling client funds. (Examiner's Interim Report ¶ No. 116.) However, the Examiner stated that during "[o]ur investigation, we noticed several instances of commingling of client funds and monies of one client being used to pay another client's freight bills." (*Id*. ¶ No. 118.) "In addition to comingling of funds between client designated accounts, I noted instances where funds were transferred to multiple client designated accounts and commingled on the same date." (*Id*. ¶ No. 119.) "We also noted instances where funds were transferred from one client designated account to another client designated account to fund an account with a negative balance." (*Id*. ¶ No. 120.) Lastly, the Examiner points out that some freight invoiced of one client were paid directly from another client designated account. (*Id*. ¶ No. 121.)

[5] In the Examiner's Interim Report, these payments are labeled as "Criminal Attorney" and "Prepaid – Legal/Retainer." (Examiner's Interim Report at 60, 64.) This retainer does not appear on the Debtor's Amended Schedules (Doc. No. 152). It remains unclear why the Debtor made this payment and for whose benefit it was made, as the Debtor does not appear to be the subject of a criminal action.

      d.      When the Court asked "Who runs the company?" the Examiner responded "I felt that there was no one in charge. . . I did not feel that there was a leader in charge."[6] (*Id.* at 52, Lines 22-23; *Id.* at 53, Lines 23-24.)

    12.    The Examiner's Interim Report also outlined numerous insider transactions. Based on the Debtor's books and records, the Debtor has loaned and/or advanced money to various owners/officers/employees of the Debtor as follows:

      a.      J. McNett borrowed $350,361.69 from the Debtor in January 2011 to purchase residential property. As of March 6, 2019, the outstanding debt is $273,577.73. (Examiner's Interim Report ¶ 92-93.)

      b.      Steven Huntley, a former employee, received a total of $270,767.68 between 2009 and 2012. As of March 6, 2019, Steven Huntly owed the Debtor $136,188.32. (*Id.* ¶ 94-95.)

      c.      A prior owner of the Debtor, Charles Casey, borrowed funds from IPS in 2008 for the purchase of a home located at 2090 West Spruce Creek Circle, Port Orange, Florida. After the Charles Casey Separation Agreement became effective January 3, 2011, Charles Casey stopped making payments on his loan, and the Debtor took title of the home, which it later sold to Carlos G. Lira and Amanda L. Lira. Mr. and Mrs. Lira owe the Debtor $549,924.82 as of March 6, 2019. (*Id.* ¶ 97–100.)

      d.      Tony Albanese borrowed $200,000 from the Debtor on March 31, 2014. Upon information and belief, Tony Albanese was part of Cycle Up Supply Chain Services,

---

[6] According to the Examiner's Interim Report, the Examiner concluded that the Debtor's leadership does not have sufficient knowledge to handle the day-to-day operations effectively and therefore should not continue to receive compensation. (Examiner's Interim Report ¶ 140.)

a logistics business started under IPS seven years ago. When Mr. Albanese left his position at IPS, he purchased Cycle Up Supply Chain Services resulting in the notes receivable due to the Debtor of which $13,257.55 is currently due. (*Id.* ¶ 107-108.)

  e. Arthur R. Porcelli (Davies' son-in-law) obtained a $75,000 loan from the Debtor on or about March 2, 2016, which was classified by the Debtor as a short-term mortgage. Mr. Porcelli repaid this loan in full on or about December 4, 2017. (*Id.* ¶ 109.)

  f. Neal Sheppard (Davies' son-in-law) borrowed $60,000 from the Debtor in November 2016 and repaid it on or about March 9, 2018. (*Id*. ¶ 110.)

  g. On or about June 30, 2016, Davies borrowed $300,000 from the Debtor for the purchase of his home. Davies repaid this loan on or about August 31, 2016. (*Id.* ¶ 111-112.)

  h. Additionally, Davies and his wife sold vacant land that they owned located at 628 River View Road, Flagler Beach, Florida to the Debtor on August 15, 2016, for $375,000. The Debtor sold the property on January 25, 2019, (the Petition Date) and received net proceeds of $315,765.09. Due to this insider transaction, the Debtor lost approximately $69,303.35. (*Id.* ¶ 103, 105-106.)

13. On March 7, 2019, Stanley Black & Decker, Inc. filed a Request for Judicial Notice (Doc. No. 192; "Judicial Notice"). According to the Judicial Notice, M. McNett was the subject of certain court filings originating in the matter styled Shanghai Centre, et. al. v. Michael McNett, et. al., United States District Court, Central District of California Case No. CV-00-3469-SVW (RCx), consolidated with Case No. CV-00-7805-SVW (RCx). Attached to the Judicial Notice as Exhibit A is the Stipulation ("Stipulation") between Plaintiffs Shanghai Centre and Seacliff

Limited and Defendants Michael McNett and Helen McNett regarding: entry of partial final judgment in favor of plaintiffs in the amount of $4,025,624.61 and related matters, as recorded in O.R. Book 9992, Page 520, Public Records of Duval County, Florida. Specifically, Recital G on page 3 of the Stipulation states:

> G. Based on the evidence developed in this action, Mr. McNett made false representations to Plaintiffs by submitting false payment vouchers for personal expenses and cash advance requests. Mr. McNett knew that said representations were false at the time they were made as evidenced by Mr. McNett's attempt to disguise his expense claims. Because Mr. McNett was Seacliff Limited's Director of Finance, Mr. McNett was aware of Plaintiffs' reimbursements procedures, and Mr. McNett was aware of the unauthorized nature of the expense claims for which he sought reimbursement. Mr. McNett submitted his false claims with the expectation that Plaintiffs would reimburse him; Mr. McNett submitted the false claims with the intention and purpose of deceiving Plaintiffs. *As Plaintiffs' Director of Finance, Mr. McNett was responsible for the financial operations of Seacliff Limited, maintained Seacliff Limited's books and records, and authorized appropriate disbursements.* Given Mr. McNett's position as Director of Finance, Plaintiffs relied on Mr. McNett's representations, permitting Mr. McNett to receive reimbursement for his personal expenses and to receive salary advances. *Plaintiffs sustained monetary loss in the amount of $4,025,624.61 as a proximate result of Mr. McNett making false representations regarding his personal expenses and seeking authorized salary advances.*

(Stipulation at Recital G; emphasis added).

14. Based on the Amended Statement of Financial Affairs (Doc. No. 152) and the Examiner's Interim Report, Davies engaged in numerous financial transactions with significant impact on the Debtor on the Petition Date, including:

> a. Remitting $150,000 for a retainer to "Criminal Attorney" (Examiner's Interim Report at 64) that is not disclosed in any of the Debtor's filings.

      b.      Executing an asset purchase agreement to sell a division of the Debtor's business to a former employee (Doc. No. 152 at 10) that was first disclosed on February 8, 2019 (Doc. No. 92 at 28).

      c.      Closing the real estate transaction to sell the Debtor's vacant land in Flagler Beach, Florida (Doc. No. 152 at 10) that was first disclosed on February 8, 2019 (Doc. No. 92 at 28).

When viewed collectively, these events and the delay in (or lack of) disclosure appear to demonstrate that Davies' credibility and the Debtor's good faith in filing this case may be questionable.

15.    At the hearing on March 7, 2019, the Court permitted any party filing a motion to appoint a trustee to be heard on a preliminary basis in conjunction with the continued status conference scheduled for March 26, 2019, which was later rescheduled to April 5, 2019.

16.    On March 18, 2019, the UST conducted a continued meeting of creditors ("Continued Meeting"), at which Davies and M. McNett testified on behalf of the Debtor. M. McNett's testimony included the following:

      a.      In 1998, M. McNett acquired his 22% interest in the Debtor by loaning the Debtor $1 million. (Continued Meeting Trans. at 12, Lines 1-16.)

      b.      In 2010, the Debtor hired him to be the Chief Financial Officer (*Id*. at 10-11), but he testified "I don't have no treasury capacity and I have no financial segment capacity, so it's not really, you know, truly a CFO position." (*Id*. at 17, Lines 9-11.)

      c.      M. McNett described his duties as dealing primarily with customer communication and relationship management. (*Id*. at 17.) His duties did not involve monitoring the Debtor's bank accounts, reviewing the results of annual audits performed by external accountants, or processing customer payments or operating expenses. (*Id*. at 18, 21)

      d.      He stated that he reported direcly to Davies. (*Id*. at 17, Lines 18-19.)

      e.      M. McNett testified that all of the Debtor's bank accounts were solely maintained by Brandy Peterson and he was not involved in the setup of the accounts or the change from a singular account to segregated customer accounts. (*Id*. at 19, Lines 3-24.)

      f.      M. McNett stated that he did not have access to the Debtor's bank accounts and did not have signatory authority on any of the Debtor's bank accounts until after Brandy Peterson left in January 2019. (*Id*. at 65-66.)

      g.      As of March 7, 2019, M. McNett has not had any dealings with the Debtor or its operations, except for one phone call with an employee in the mailroom requesting for his mail to be redirected to the Examiner. (*Id*. at 87-88.)

      h.      M. McNett acknowledged the terms of the Stipulation and prior criminal convictions. (*Id*. at 34-64.)

      i.      M. McNett stated that the source of the $1 million he loaned to the Debtor in 1998 to acquire his interest was from the salary earned as Chief Financial Officer of Seacliff Limited and not from the funds he fraudulent diverted from Seacliff Limited. (*Id*. at 63, Lines 11-25.)

17. Davies' testimony at the Continued Meeting included the following:

    a. Davies was aware of M. McNett's felony fraud conviction before he hired M. McNett to be the Chief Financial Officer of the Debtor, but did not seek any details or additional information. (*Id*. at 124-125.)

    b. Davies testified that he did not have a protocol in place to oversee M. McNett's communications with customers or monitor his work (*Id*. at 126) and did not warn customers who were sending millions of dollars to the Debtor about M. McNett's history.

    c. Davies stated that M. McNett supervised Brandy Peterson[7], who was the only person who had access to customer accounts, processed transactions for customer payments, or possessed passwords for online banking access. (*Id*. at 92.) He testified: "Over the years she was the only one who ever had access to that. Never – over the year, she always had access to those accounts and controlled and managed those accounts. <u>And I've never actually seen the accounts, or knew how many accounts there were, actually, for that matter</u>." (*Id*. at 91-92, emphasis added.)

18. At the Continued Meeting, Davies (66% owner of the Debtor) testified that he resigned from his position as President of the Debtor as of March 7, 2019. (*Id*. at 88.) M. McNett (22% owner of the Debtor) testified that he resigned from his position as Chief Financial Officer of the Debtor and that his brother, Jacques McNett (11% owner of the Debtor), had also resigned from his position as Vice President on the same date. (*Id*. at 86, 134) As of the date of the

---

[7] M. McNett denied ever being her supervisor. (*Id*. at 92-93.)

Continued Meeting, Davies and M. McNett were unclear about who has been in charge of the Debtor since March 7, 2019. M. McNett suggested that the Debtor was likely being operated by the Examiner (Maria Yip) and two employees (Josh Rhinehart and Mark Benoliel). (*Id*. at 89-90.)

### III.  GROUNDS FOR RELIEF

**A.   Appointment of a Chapter 11 Trustee**

19.   Section 1104(a) of the Bankruptcy Code provides as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a).

20.   The movant seeking the appointment of a chapter 11 trustee bears the burden of proof only by a preponderance of the evidence. *See Keeley &. Grabanski Land P'ship v. Keeley (In re Keeley and Grabankski Land P'ship)*, 455 B.R. 153, 162-163 (8th Cir. BAP 2011) (adopting preponderance of the evidence standard).[8]

---

[8] *See also Tradex Corp. v. Morse*, 339 B.R. 823, 830-32 (D. Mass. 2006) (same); *In re Altman*, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999), *vacated in part on other grounds*, 254 B.R. 509 (D.

21.     Through Section 1104(a)(1), Congress has mandated that the chapter 11 debtor in possession, which acts as a fiduciary of the creditors of the bankrupt estate, be an honest broker. *See Wolf v. Weinstein*, 372 U.S. 633, 651 (1963) (acknowledging the willingness of courts to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee"); *In re V. Savino Oil and Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (stating that "the willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in possession defaults in this respect, Section 1104(a)(1) [of the Code] commands that stewardship of the reorganization effort must be turned over to an independent trustee.") (cited with approval in *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998)).

22.     The plain language of Section 1104(a)(1) (specifically, the use of the word "shall") indicates that this Court has no discretion to look past a finding of "cause" in ordering the appointment of a trustee. For example, if "current management" was found to be incompetent

---

Conn. 2000) (adopting preponderance standard); *In re Berwick Black Cattle Co*., 405 B.R. 907, 912 (C.D. Ill. 2009); *In re Plaza del Retiro, Inc*., 417 B.R. 632, 640 (Bankr. D.N.M. 2009) (noting split of authority on burden of proof issue); *see also Grogan v. Garner*, 498 U.S. 279, 286 (1991) (noting that the general standard of proof in civil and bankruptcy cases, and in nondischargeability litigation in particular, is a preponderance of the evidence). *But see In re Marvel Entertainment Group, Inc*., 140 F.3d at 471 (3d Cir. 1998) (requiring clear and convincing evidence for the appointment of a trustee under 11 U.S.C. § 1104(a)).

The continued use of the clear and convincing standard by some courts following the 2005 enactment of 11 U.S.C. § 1104(e) has been questioned. *See* Clifford J. White III & Walter W. Theus, Jr., *Chapter 11 Trustees and Examiners After BAPCPA*, 80 AM. BANKR. L. J. 289, 315-16 (2006) (because 11 U.S.C. § 1104(e) requires the United States Trustee to file a motion for appointment of a trustee based only upon "reasonable grounds to suspect fraud or other dishonest conduct," the adoption of § 1104(e) "calls for a reexamination of the case law that established this heightened level of proof.").

due to acts or omissions which occurred prior to the Petition Date, this Court must direct the appointment of a trustee. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) (stating that "[11 U.S.C. § 1104](a)(1) requires the bankruptcy court, upon motion, to appoint a trustee when the movant has proved 'cause,' which the statute defines to include incompetence and gross mismanagement."); *In re National Staffing Servs., LLC*, 2005 WL 3729404 at *2 (Bankr. N.D. Ohio Nov. 21, 2005) (11 U.S.C. § 1104(a)(1) provides for "the mandatory appointment of a trustee upon a specific finding of 'cause.'").

23. As evidenced by the testimony of Davies at the First Meeting, the Examiner's Interim Report, the Examiner's comments in open court at the hearing on March 7, 2018, and the record in this case, Davies, M. McNett, and J. McNett are the Debtor's "current management" under Section 1104(a)(1). In fact, Davies, M. McNett and J. McNett have been involved in governing the Debtor since its inception.[9]

24. There can be no doubt that what the Debtor has disclosed in the papers filed with this Court and at the first meeting of creditors (and further illuminated in the Examiner's Interim Report), as set forth above, constitute, at a minimum, "incompetence" by management under Section 1104(a)(1). In addition, if it is Davies' contention that he was not aware of the accounting discrepancies, or that he is unable to properly account for the tens of millions of dollars the Debtor collected from customers and explain the unauthorized comingling of funds, then he has failed to fulfill his obligations as a fiduciary of the Debtor. Thus, he cannot be entrusted with the fiduciary responsibilities of a debtor-in-possession.

---

[9] Davies testified at the First Meeting that the Debtor was originally owned by five people, but in 2011 Mr. Douglas Cook and Mr. Charles Casey departed from ownership. (*See* First Meeting Trans. at 6, Lines 11-12.)

25. Davies in effect abandoned his fiduciary responsibilities and relinquished control of the Debtor's finances to M. McNett, who has a criminal history involving financial crime committed in a similar fiduciary role to what he now serves in for the Debtor. In the instant case, there is no independent director or manager. As of the filing of this pleading, it is uncertain who is in charge of the Debtor. These facts demand the appointment of a trustee for "cause" under Section 1104(a)(1).

26. Moreover, based on these circumstances, the appointment of a trustee is also in the best interests of creditors under Section 1104(a)(2).

> When a trustee is appointed "in the interests of creditors," however, it is not necessary to find that a debtor-in-possession or management has engaged in any misdeeds. *In re Sharon Steel*, 871 F.2d 1217, 1226 (3d Cir. 1989). When deciding whether a trustee should be appointed under § 1104(a)(2) a court will consider: (1) debtor's trustworthiness; (2) past and present performance and the potential for reorganization; (3) whether creditors have confidence in present management; (4) and the benefits of appointing trustee balanced against the cost of appointment. *In re Eurospark Indus.*, 424 B.R. 621, 621 (Bankr. E.D.N.Y. 2010).

*In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016). Here, the Court has ordered all of the Debtor's bank accounts (except for two newly opened debtor-in-possession accounts at Wells Fargo) to remain frozen – in large part because the Debtor has been unable to establish what funds are rightfully its. The management's inability to offer convincing explanations as to the whereabouts of the customers' funds appears to warrant a lack of trustworthiness and confidence. As a result, Section 1104(a)(2) separately and independently supports the appointment of a chapter 11 trustee.

**B.  Conversion to Chapter 7**

27. In the alternative, cause exists pursuant to 11 U.S.C. § 1112(b) for the conversion of this case to chapter 7. Section 1112(b)(1) provides:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

28. Under 11 U.S.C. § 1112(b)(4)(B) and (C), the term "cause" in Section 1112(b)(1) includes, among other things, gross mismanagement of the estate.

29. Through the amendments to Section 1112(b), Congress eliminated this Court's discretion that was previously suggested with the use of the permissive word "may" in the subsection and, through substitution of the mandatory word "shall" for "may," directed this Court to convert or dismiss the case, "whichever is in the best interests of the creditors and the estate," if "cause" is established. 7 COLLIER ON BANKRUPTCY § 1112.04(1) (15th ed. rev. 1980) ("... as amended in 2005, section 1112(b) circumscribes the court's discretion by directing certain instances in which the court must, and must not, convert or dismiss the case."); *see also Association of Civilian Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.").

30. As of the filing of this pleading, the Debtor has not filed any monthly operating reports, and the range of administrative expenses remain unknown. Given the Debtor's current limited operations and the numerous professionals likely to be paid out of the estate, administrative insolvency appears imminent.

31. Mismanagement pervades this case. According to the Examiner, there is no clear management or supervision of the Debtor's operations. No one is in charge. The Debtor's alleged misappropriation of millions of dollars (or lack of cogent explanation for the discrepancy between the amounts put forth by customers and those funds advanced to freight providers) is indicative of this fact. The Debtor was, at a minimum, mismanaged while under the direction of current management. With the resignations of the President (Davies), Vice President (J. McNett), and Chief Financial Officer (M. McNett), the Debtor's operations appear uncertain. Accordingly, the appropriate remedy under the Code is either the appointment of a chapter 11 trustee or conversion of this case, followed by the appointment of a chapter 7 trustee.

WHEREFORE, the UST requests that this Court issue an order directing the appointment of a chapter 11 trustee, or, in the alternative, issue an order converting this case to chapter 7, and providing for such other and further relief as the Court deems just and proper under the circumstances of this case.

DATED: March 21, 2019.

Respectfully submitted,

Daniel M. McDermott
United States Trustee, Region 21

 /s/ Audrey M. Aleskovsky
Audrey M. Aleskovsky, Trial Attorney
United States Department of Justice
Office of the United States Trustee
Florida Bar No.: 0103236
400 W. Washington Street, Suite 1100
Orlando, FL 32801
Telephone No.: (407) 648-6301, Ext. 130
Facsimile No.: (407) 648-6323
audrey.m.aleskovsky@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing motion has been served electronically through CM/ECF on March 21, 2019, to all parties having appeared electronically in the instant matter. **I HEREBY CERTIFY** further that a copy hereof shall be served by U.S. Mail, postage prepaid, on March 21, 2019 to the following:

IPS Worldwide, LLC
265 Clyde Morris Blvd, Ste 100
Ormond Beach, FL 32174

                                                              */s/   Audrey M. Aleskovsky*
                                                Audrey M. Aleskovsky, Trial Attorney