# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION
**www.flmb.uscourts.gov**

**In re:**                                                     **CASE NO. 6:19-bk-00511-KSJ**

**IPS WORLDWIDE, LLC,**                                        **CHAPTER 11**

                             **Debtor.**
_____/

### JOINT MOTION BY CHAPTER 11 TRUSTEE,
### ALEX D. MOGLIA AND EXFREIGHT ZETA, LLC TO APPROVE
### SETTLEMENT AGREEMENT PURSUANT TO BANKRUPTCY RULE 9019

---

### NOTICE OF OPPORTUNITY TO OBJECT AND FOR HEARING

Pursuant to Local Rule 2002-4, the Court will consider the relief requested in this paper without further notice or hearing unless a party in interest files a response within twenty-one (21) days from the date set forth on the attached proof of service, plus an additional three (3) days for service if any party was served by U.S. Mail. You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated.

If you object to the relief requested in this paper, you must file a response with the Clerk of the Bankruptcy Court, George C. Young Federal Courthouse, 400 W. Washington Street, Suite 5100, Orlando, FL 32801 and serve a copy on the movant's attorney, R. Scott Shuker, Esq., Shuker & Dorris, P.A., 121 S. Orange Avenue, Suite 1120, Orlando, Florida 32801, and any other appropriate persons within the time allowed. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing, or consider the response and grant or deny the relief requested without a hearing.

If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.

---

**CHAPTER 11 TRUSTEE, ALEX D. MOGLIA** ("Trustee"), together with

**EXFREIGHT ZETA, LLC** ("Zeta") (Trustee and Zeta shall be collectively referred to herein as

the "Settlement Parties"), move this Court, pursuant to 11 U.S.C. §105(a) and Rule 9019 of the

Federal Rules of Bankruptcy Procedure, for an Order approving the settlement reached by the

Settlement Parties that resolves various matters between them as set forth in this motion (the "Settlement"). In support of this motion, the Settlement Parties state as follows:

## BACKGROUND

1.    On January 25, 2019 (the "Petition Date"), IPS Worldwide, LLC (the "Debtor") filed its petition for relief under Chapter 11 of the Bankruptcy Code.

2.    On April 5, 2019, the Court entered an order granting the motions of the U.S. Trustee (Doc. No. 227) and creditor, Stanley Black & Decker, Inc. (Doc. No. 290) for the appointment of a Chapter 11 trustee in the Debtor's bankruptcy case. That same day, Alex D. Moglia was appointed to serve as Chapter 11 Trustee for the Debtor (Doc. No. 291).

3.    On April 15, 2019, Zeta commenced an adversary proceeding against the Trustee, DACACO Holdings, LLC ("DACACO"), Exfreight of Florida, LLC ("EOF"), and Steven Huntley ("Huntley") requesting a declaratory judgment regarding the membership interests in EOF and a determination as to whether transfers made to Zeta were recoverable by the Trustee, as well as an injunction as to information on the Debtor's webpage (the "Zeta Adversary Proceeding").

4.    On April 24, 2019, Zeta filed a Motion to Determine that the Barton Doctrine does not apply to the Zeta Adversary Proceeding (the "Barton Doctrine Motion") (Doc. No. 341). On May 1, 2019, the Court entered a scheduling order regarding the Barton Doctrine Motion ("Scheduling Order") (Doc. No. 367).

5.    The Settlement involves the compromise of the Zeta Adversary Proceeding, the Barton Doctrine, and the Scheduling Order.

## MATERIAL TERMS OF THE SETTLEMENT AGREEMENT

6.    As a result of the good-faith, arms –length negotiations, and to avoid the expense, inconvenience, delay, and to expedite the resolution of the issues raised in the Zeta Adversary

Proceeding and Barton Doctrine Motion, the Settlement Parties have reached a compromise and settlement, the approval of which will aid in furthering the administration of the Debtor's estate. The terms of the Settlement are set forth herein and meet all applicable legal standards and are well within the range of reasonableness.

      7.      The provisions of the Settlement include:

      a.      This Settlement Agreement shall be effective upon Bankruptcy Court approval ("Effective Date").

      b.      The Trustee will commence an adversary (the "IPS Adversary Proceeding") against Zeta, EOF, DACACO and Huntley pursuant to Sections 544 and 550 of Title 11 of the United States Code (the "Bankruptcy Code"), Chapter 726, Florida Statutes, and Rule 7001 of the Federal Rules of Bankruptcy Procedure, seeking to avoid actual and constructively fraudulent conveyances, and obtain a declaratory judgment as to the ownership and member rights of EOF. The fraudulent conveyances consist of monetary transfers totaling $1,055,796.85 and the transfer of membership interests in EOF. A copy of the complaint to be filed in the IPS Adversary is attached hereto as **Exhibit "A"** and is incorporated herein by reference (the "Complaint").

      c.      The Complaint will be filed with the Court within five (5) days of entry of an order approving the Settlement.

      d.      The Trustee and Zeta will immediately settle the IPS Adversary Proceeding under the terms of a settlement agreement consistent with this Settlement. A copy of the consent final judgment against Exfreight Zeta, LLC is attached hereto as **Exhibit "B"** and is incorporated herein by reference (the "Final Judgment").

e.    Zeta admits no liability with respect to Count VII of the Complaint, had no knowledge of the Debtor's fraudulent intent with respect to the EOF Fraudulent Transfers (as defined in the Complaint), and did not actively participate in the fraudulent conveyances.

f.    Upon entry of a judgment against DACACO and Huntley which divests DACACO and Huntly of any ownership in EOF and/or Zeta, Zeta (or its assigns) would have three (3) months from the date of written notice to Zeta to redeem or take assignment of such ownership in return for paying the bankruptcy estate $1,055,796.85. The Trustee shall provide written notice to Zeta's counsel via US Mail at Michael A. Kaufman, Esq., 1615 Forum Place, Suite 3A, West Palm Beach, Florida 33401, via US Mail to Zeta at Attn: Charles Marrale, 2290 10th Avenue North, #501, Lake Worth, Florida 33461 and email to Zeta's counsel at michael@mkaufmanpa.com, upon entry of a judgment against DACACO and/or Huntley, or upon other relief which divests DACACO and Huntly of any ownership in EOF and/or Zeta.

g.    If the Trustee is not successful in avoiding or recovering DACACO's interest in EOF and/or Zeta within fifteen (15) months, the obligation of Zeta to pay the $1,055,796.85 will be waived and Zeta will receive a release of any claims by the estate.

h.    If the Trustee is successful in avoiding or recovering DACACO's and/or Huntley's interest in EOF and/or Zeta within fifteen (15) months but Zeta does not pay the $1,055,796.85 within the agreed three (3) months, the estate will be entitled to entry of a final judgment against Zeta in the amount of $1,055,796.85, or, at the option of the Trustee, to invoke its rights as owner of EOF and/or Zeta.

i.    Once payment is made by Zeta or an entity on behalf of Zeta, the Trustee will assign the bankruptcy estate's interest that DACACO and/or Huntley had in Zeta and/or EOF to the Zeta entity which provides the payment due under the Settlement. Furthermore, the Trustee

will transfer and assign any and all remaining interests which the bankruptcy estate may have in Zeta and/or EOF to the Zeta entity which provides the payment due under the Settlement. Attached as **Exhibits "C"** and "**D**" are forms of the assignment which will be used.

       j.     The deposition previously scheduled for July 9, 2019, will remain open subject to being re-noticed by Zeta without the need for further subpoena should these settlement negotiations not be consummated by January 10, 2020.

       k.     If the Trustee obtains default judgments against DACACO and/or Huntley or reaches an agreement with the foregoing parties, the Trustee will present evidence before the Court with the assistance of Zeta, in order to have the Court rule in its order a findings of fact and conclusions of law which will state that all interest that DACACO and/or Huntley may have in Zeta and/or EOF will vest in the Trustee.

       l.     This Settlement shall not in any way release, impair, reduce or otherwise affect the Complaint or any other complaints, whether now pending or hereafter filed, by the Trustee against any person or entity other than Zeta.

       m.     Upon payment of the $1,055,796.85, the Trustee will enter in a general mutual release against Zeta and Charles Marrale subject to the terms of the Settlement. A copy of the form general mutual release is attached hereto as **Exhibit "E"**.

       n.     The Trustee and Zeta will seek a continuance of the hearing on the Barton Doctrine Motion.

## BASIS FOR RELIEF REQUESTED

### A. The Settlement Agreement Satisfies the *Justice Oaks* Factors

8.     Through this motion, the Settlement Parties request that this Court enter an Order approving the Settlement to permit the amicable resolution of the Claims Litigation, Adversary

Proceedings and Appeals. "It is generally recognized that the law favors compromise of disputes over litigation for litigation sake." *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993). As a matter of policy, compromises and settlements are favored in order to minimize litigation and expedite the administration of the bankruptcy estate. *Munford v. Munford (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996).

9.        When considering settlements for approval under Bankruptcy Rule 9019, the bankruptcy court is to "determine whether the proposed settlement is fair and equitable." *In re Kay*, 223 B.R. 816, 819 (Bankr. M.D. Fla. 1998); *In re Gallagher*, 283 B.R. 342, 346 (Bankr. M.D. Fla. 2002). The Eleventh Circuit Court of Appeals has set forth factors to assist bankruptcy courts in determining whether a settlement proposal meets the appropriate standard. *In re Air Safety Int'l, L.C.*, 336 B.R. 843, 852 (S.D. Fla. 2005). These factors are as follows: (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interests of creditors and proper deference to their reasonable views. *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544 (11th Cir. 1990).

10.      It is not necessary for a bankruptcy court to explicitly consider all four *Justice Oaks* factors when approving a proposed settlement. *Chira v. Saal, et al. (In re Chira)*, 567 F.3d 1307, 1313 (11th Cir. 2009) (affirming bankruptcy court's approval of settlement agreement where bankruptcy court explicitly evaluated only two of the four Justice Oaks Factors.) Also, a bankruptcy court is not obligated to actually rule on the merits of the various claims or conduct a "mini trial" on the merits of the underlying action. *In re Van Diepen, P.A.*, 236 F. Appx. 498, 503 (11th Cir. 2007) see also, *In re Soderstrom*, 477 B.R. 249, 252 (Bankr. M.D. Fla. 2012). Rather,

settlements or compromises should be approved unless they "fall below the lowest point in the range of reasonableness." *In re Bicoastal Corp.*, 164 B.R. at 1016.

11.     The Settlement Parties submit that the Settlement overwhelmingly satisfies the *Justice Oaks* factors. The Settlement is the product of extensive settlement discussions and negotiations between the Settlement Parties. The Settlement Parties submit that the Settlement is the direct result of the exercise of their business judgment and is in the best interests of the Debtor's estate when considering the uncertainties, significant expense, and potential delay involved in resolving the various claims between them.  As such, the Settlement Parties believe that the compromise set forth in the Settlement is reasonable and falls well above the lowest point on the range of reasonableness as required by Rule 9019(a) of the Federal Rules of Bankruptcy Procedure and applicable case law. *See Id.* at 1016 (quoting *In re W.T. Garant Co.*, 699 F.2d 599 (2d Cir. 1983).

12.     ***The Probability of Success in the Litigation.*** The first *Justice Oaks* factor reflects the Supreme Court's view that a court should form an "intelligent and objective opinion" of the probability of success in the underlying litigation and inherent costs in such litigation. *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). In fact, some courts have identified this factor as most important in determining the reasonableness of a settlement under Bankruptcy Rule 9019(a). *In re Adelphia*, 327 B.R. 143, 160 (Bankr. S.D.N.Y. 2005) (This factor . . . is in my view the most important factor, and I weigh it accordingly.").  In the instant case, the litigation involves multiple parties and multiple causes of action regarding the same nucleus of facts.  Although the Trustee firmly believes in the strength of his position, the Trustee recognizes that there is always inherent risk in any litigation.

13.     *The Complexity of Litigation*.  In evaluating the reasonableness of a settlement, a court should "form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *TMT Trailer*, 390 U.S. at 424. The issues raised in the IPS Adversary Proceeding, the Zeta Adversary Proceeding and the Barton Doctrine Motion, will be the subject of extensive litigation on a number of fronts resulting in multiple rounds of discovery and voluminous briefing.  By settling with one party of the IPS Adversary Proceeding, and disposing of the Zeta Adversary Proceeding and the Barton Doctrine Motion, the Settlement reduces the complexity of the remaining litigation.

14.     *The Interests of the Creditors*.  In considering the paramount interest of the creditors, the Settlement Parties necessarily weighed all of the *Justice Oaks* factors.  In this case, the Settlement resolves all of the outstanding issues between the Settlement Parties; prevents the Settlement Parties from undertaking expensive, protracted, multi-party litigation involving complex issues of both facts and law; and provides for the potential of eventual payment of the fraudulent conveyances in full.

15.     After considering all the attending factors, the Settlement Parties believe that the Settlement is reasonable and in the best interests of the estate, and will resolve all disputes among the Settlement Parties avoiding delay and costly litigation with respect thereto. For all the foregoing reasons, the Settlement Parties believe that good cause exists for approval of the Agreement. The Agreement not only surpasses the minimum threshold of reasonableness necessary to warrant approval, but it represents the best possible outcome for the Debtor and its estate and creditors.

**WHEREFORE**, the Settlement Parties respectfully request that the Court enter an order approving the proposed settlement, authorizing the parties to consummate the settlement pursuant to the terms of the Settlement, and granting such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED** this 10th day of January 2020.

/s/ Mariane L. Dorris, Esq.
**R. Scott Shuker, Esq.**
Florida Bar No. 0984469
rshuker@shukerdorris.com
**Mariane L. Dorris, Esq.**
Florida Bar No. 0173665
mdorris@shukerdorris.com
**SHUKER & DORRIS, P.A.**
121 South Orange Avenue, Suite 1120
Orlando, Florida 32801
Tel:    (407) 337-2060
Fax:    (407) 337-2050
*Attorneys for Alex D. Moglia, Trustee for
the Bankruptcy Estate of IPS Worldwide,
LLC*

/s/ Michael A. Kaufman
**Michael A. Kaufman, Esq.**
Florida Bar No. 628042
michael@mkaufmanpa.com
**Michael A. Kaufman, P.A.**
1615 Forum Place, Suite 3A
West Palm Beach, Florida 33401
Phone: (561) 478-2878
Fax : (561) 584-5555
*Attorneys for Exfreight Zeta, LLC*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:                                                          CASE NO.  6:19-bk-00511-KSJ

IPS WORLDWIDE, LLC,                                   CHAPTER 11

                         Debtor.
_____/

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of **JOINT MOTION BY CHAPTER 11 TRUSTEE, ALEX D. MOGLIA AND EXFREIGHT ZETA, LLC, TO APPROVE SETTLEMENT AGREEMENT PURSUANT TO BANKRUPTCY RULE 9019**, has been furnished by electronic mail and/or by U.S. First Class, postage prepaid mail to all parties who have requested notice in this case, including: Chapter 11 Trustee, Alex D. Moglia, Moglia Advisors, 1325 Remington Road, Suite H, Schaumburg, IL 60173; ExFreight Zeta, LLC, c/o Michael A. Kaufman, Esq., 1615 Forum Place, Suite 3A, West Palm Beach, FL 33401, michael@mkaufmanpa.com; Debtor, c/o Scott W. Spradley, Esq., Law Offices of Scott W. Spradley, P.A., 109 S. 5th Street, Flagler Beach, Florida 32136; Maria Yip, Examiner, c/o Tiffany Paynee Geyer, Esq., tpaynegeyer@bakerlaw.com, Baker Hostetler LLP, 200 S. Orange Avenue, Suite 2300, Orlando, Florida 32801; Counsel for Creditors Committee, Rafael X. Zahralddin-Aravena, Esq., Elliott Greenleaf, P.C., 1105 N Market Street, Suite 1700, Wilmington, DE 19801, rxza@elliotgreenleaf.com; Eric M. Sutty, Elliot Greenleaf, P.C., 1105 N. Market Street, Suite 1700, Wilmington, DE 19801, ems@elliotgreenleaf.com; Bradley M. Saxton, Esq. and Ryan E. Davis, Esq., Winderweedle, Haines, Ward & Woodman, PA, 329 Park Avenue North, 2nd Floor, Winter Park, FL 32789, bsaxton@whww.com; rdavis@whww.com; Audrey M. Aleskovsky and Charles R. Sterbach, Office of the United States Trustee, 400 W. Washington Street, Suite 1100, Orlando, Florida 32801, audrey.m.aleskovsky@usdoj.gov; Charles.r.sterbach@usdoj.gov;; and to the LBR 1007-2 parties-in-interest matrix, as shown on the matrix attached to the original response filed with the Court, on this 10th day of January 2020.

                              /s/ Mariane Dorris
                              Mariane Dorris, Esquire

Label Matrix for local noticing
113A-6
Case 6:19-bk-00511-KSJ
Middle District of Florida
Orlando
Fri Jan 10 15:19:29 EST 2020

AREP Eight Tower Bridge LLC
c/o Zachary J. Bancroft, Esq.
Baker Donelson, et al.
200 S. Orange Ave., Ste. 2900
Orlando, FL 32801-3448

Aclara Meters LLC
c/o James A. Timko, Esq.
Shutts & Bowen LLP
300 S. Orange Ave., #1600
Orlando, FL 32801-3382

Advanced Business Capital
d/b/a Triumph Business
c/o Ullman & Ullman, P.A.
7700 W. Camino Real, Ste 401
Boca Raton, FL 33433-5543

Alcoa Corporation
201 Isabella St. Ste. 500
Pittsburgh, PA 15212-5858

Alex D. Moglia, Chapter 11 Trustee
Moglia Advisors
1325 Remington Road, Suite H
Schaumburg, IL 60173-4815

Arcelor Mittal
250 W US HIghway 12
Burns Harbor, IN 46304-9727

Arconic, Inc.
Arconic Corporate Center
201 Isabella St.
Pittsburgh, PA 15212-5858
Attn: Melanie Smith, Legal Dept.

Atkore International
16100 S Lathrop Avenue
Harvey, IL 60426-6021

Atkore International, Inc.
c/o Jordi Guso, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Bio-Rad Laboratories
1000 Alfred Nobel Drive
Hercules, CA 94547-1898

Bossard, Inc.
Stephanie C. Lieb, Esq.
101 East Kennedy Boulevard, Suite 2700
Tampa, Florida 33602-5150

Bossard,Inc.
909 W. Pinnacle Peak Road
Phoenix, AZ 85027-1419

Colgate Palmolive Company
c/o Stephanie Lieb
101 E. Kenneday Boulevard
Suite 2700
Tampa, FL 33602-5150

Conduent, Inc., fka Xerox Business Services,
fka Affiliated Computer Services, Inc.
c/o Larry A. Levick, Singer & Levick PC
16200 Addison Road, Suite 140
Addison, TX 75001-5377

Delgado & Romanik, PLLC
c/o Jonathan M. Sykes, Esquire
200 S Orange Avenue, Suite 800
Orlando, FL 32801-6404

Elo Touch Solutions
670 N McCarthy Blvd
Ste. 100
Milpitas, CA 95035-5119

Exfreight Zetz, LLC
c/o Michael A. Kaufman, Esq.
1615 Forum Place, Suite 3A
West Palm Beach, Florida 33401-2316

Gibraltar Industries, Inc.
c/o Aaron A. Wernick, Esq.
Furr Cohen, PA
2255 Glades Road, Suite 301E
Boca Raton, FL 33431-7383

Gilbraltar Industries
3556 Lake Shore Road
Buffalo, NY 14219-1485

GlobalTranz Enterprises, Inc.
c/o Jordan D. Maglich, Esq.
Quarles & Brady LLP
101 East Kennedy Blvd., Suite 3400
Tampa, FL 33602-5195

Infineon
30805 Santana Street
Hayward, CA 94544-7030

Integrated Supply Network
2727 Interstate Drive
Lakeland, FL 33805-2304

JL French
3101 S. Taylor Drive
Sheboygan, WI 53081-9401

KTM Motorcycles
30100 Technology Drive
Murrieta, CA 92563-2542

KTM North America Inc
c/o Justin D Kreindel Esq
Wilson Elser Moskowitz Edelman & Dicker
111 N Orange Ave Ste 1200
Orlando FL 32801-2361

Lawrence M. Kosto, Esq.
Kosto & Rotella, P.A.
PO Box 113
Orlando FL 32802-0113

Life Technologies
5791  Van Allen Way
Carlsbad, CA 92008-7321

Neogen Corporation
c/o Aaron A. Wernick, Esq.
Furr Cohen PA
2255 Glades Rd., Ste 301E
Boca Raton, FL 33431-7383

NuVasive, Inc.
Bradley Arant Boult Cummings LLP
100 N. Tampa Street, Suite 2200
Tampa, FL 33602-5809

NuVasive, Inc.
c/o Edwin G. Rice
Bradley Arant Boult Cummings LLP
100 N Tampa Street, Suite 2200
Tampa, FL 33602-5809

Office of Unemployment Compensation Tax Serv
Department of Labor and Industry
651 Boas Street, Room 925
Harrisburg, PA 17121-0751

R Scott Shuker
Latham Shuker Eden & Beaudine LLP
Post Office Box 3353
Orlando, FL 32802-3353

Resource Logistics Group, Inc.
c/o Kenneth G.M. Mather, Esq.
Gunster, Yoakley & Stewart, P.A.
401 E. Jackson St, Ste 2500
Tampa, FL 33602-5226

Rexnord
4701 W. Greenfield Avenue
Milwaukee, WI 53214-5300

Rexnord Industries, LLC
c/o Jordan D. Maglich, Esq.
Quarles & Brady LLP
101 East Kennedy Blvd., Suite 3400
Tampa, FL 33602-5195

Stanley
1000 Stanley Drive
Concord, NC 28027-7679

Stanley Black & Decker, Inc.
c/o Greenberg Traurig, P.A.
Danielle S. Kemp, Esq.
101 E. Kennedy Blvd., Suite 1900
Tampa, FL 33602-5148

Stanley Black & Decker, Inc.
c/o Colin S. Baker, Esq.
Greenberg Traurig, P.A.
450 South Orange Ave., Suite 650
Orlando, FL 32801-3311

Stanley Black & Decker, Inc.
c/o I. William Spivey, II, Esq.
GREENBERG TRAURIG, P.A.
450 South Orange Ave., Suite 650
Orlando, FL 32801-3311

Stanley Black & Decker, Inc.
c/o Greenberg Traurig, P.A.
Mark D. Bloom, Esq.
333 SE 2nd Avenue
Miami, FL 33131-3238

Suez Water Technologies
c/o Glenn Reisman, Esq.
Reisman Law Firm LLC
12 Old Hollow Road
Trumbull,  CT 06611-5523

Suez Water Technologies and Solutions
c/o Glenn M. Reisman
12 Old Hollow Road, Ste. B
Trumbull, CT 06611-5523

Suez WaterTech & Solutions
4636 Somerton Road
Feasterville Trevos, PA 19053-6742

TE Connectivity
Attn: Samuel M. Koda, Jr., Esq.
2800 Fulling Mill Road
Middletown, PA 17057-3142

TE Connectivity Corporation
c/o Samuel M. Koda, Jr., Esq.
2800 Fulling Mill Road
Middletown, PA 17057-3142

TE Connectivity Corporation, et al.
c/o James A. Timko, Esq.
Shutts & Bowen LLP
300 S. Orange Ave., #1600
Orlando, FL 32801-3382

Tranzact Technologies, Inc.
c/o Denise D. Dell-Powell, Esq.
Burr & Forman LLP
200 S. Orange Ave., Suite 800
Orlando, FL 32801-6404

True Value Company, LLC
8600 W. Byn Mawr Ave.
Chicago  IL 60631-3505

Union Pacific Railroad Company
1400 Douglas St. STOP 1580
Omaha NE 68179-0002

Watlow
12001 Lackland Road
Saint Louis, MO 63146-4039

Wayne
3814 Jarrett Way
Austin, TX 78728-1298

William G. Davies
c/o Jason W. Johnson
PO Box 2809
Orlando, FL 32802-2809

XPO Logistics, Inc.
c/o Deborah L. Fletcher, Partner
6000 Fairview Road, Suite 1200
Charlotte, North Carolina 28210-2252

XPO Logistics, Inc.
c/o Leanne McKnight Prendergast
12620 Beach Blvd. Suite 3 #126
Jacksonville, Florida 32246-7130

Xerium Technologies
1401 Capital Blvd
Youngsville, NC 27596

Xerium Technologies, Inc.
c/o Holmes P. Harden
Williams Mullen
PO Box 1000
Raleigh, NC  27602
hharden@williamsmullen.com  27602-1000

YRC ENTERPRISE SERVICES, INC.
c/o Gregory R. Farkas
200 Public Square #3000
Cleveland, OH 44114-2381

YRC Enterprise Services, Inc.
YRC, Inc. d/b/a YRC Freight
Brian McDowell c/o Holland & Knight LLP
200 S. Orange Avenue, Ste 2600
Orlando, Florida 32801-3461

YRC Enterprise Services, Inc.
YRC, Inc. d/b/a YRC Freight
Robert Davis c/o Holland & Knight LLP
200 S. Orange Avenue, Ste 2600
Orlando, Florida 32801-3461

YRC Freight
10990 Roe Avenue
Overland Park, KS 66211-1213

Zekelman Industries
c/o Frank Martin Wolff, Esq.
Frank Martin Wolff, P.A.
19 E. Central Blvd., Third Floor
Orlando, FL 32801-2468

Zekelman Industries, Inc.
Attn: Angela Miu
227 W. Monroe St. Ste. 2600
Chicago, IL 60606-5082

c/o Ullman & Ullman, P.A.
Michael W. Ullman
Jared A. Ullman
7700 W. Camino Real, Suite 401
Boca Raton, FL 33433-5543


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(d)Arcelor Mittal
250 W US Highway 12
Burns Harbor, IN 46304-9727

(d)Bio-Rad Laboratories
1000 Alfred Nobel Drive
Hercules, CA 94547-1898

(d)Elo Touch Solutions
670 N McCarthy Blvd.
Ste. 100
Milpitas, CA 95035-5119

(d)Gilbraltar Industries
3556 Lake Shore Road
Buffalo, NY 14219-1485

(d)Integrated Supply Network
2727 Interstate Drive
Lakeland, FL 33805-2304

(d)KTM Motorcycles
30100 Technology Drive
Murrieta, CA 92563-2542

(d)Stanley
1000 Stanley Drive
Concord, NC 28027-7679

(d)Suez WaterTech & Solutions
4636 Somerton Road
Feasterville Trevos, PA 19053-6742

(d)TE Connectivity
Attn: Samuel M. Koda, Jr., Esq.
2800 Fulling Mill Road
Middletown, PA 17057-3142

(d)Wayne
3814 Jarrett Way
Austin, TX 78728-1298

(d)Xerium Technologies
1401 Capital Blvd
Youngsville, NC 27596

(d)YRC Freight
10990 Roe Avenue
Overland Park, KS 66211-1213

(d)Zekelman Industries, Inc.
Attn: Angela Miu
227 W. Monroe St. Ste. 2600
Chicago, IL 60606-5082

End of Label Matrix
Mailable recipients      63
Bypassed recipients      13
Total                    76

# EXHIBIT "A"

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **In re:** | **CASE NO. 6:19-bk-00511-KSJ** |
| **IPS WORLDWIDE, LLC,** | **CHAPTER 11** |
| **Debtor.** | |

_____/

| | |
|---|---|
| **ALEX D. MOGLIA, TRUSTEE,** | **Adv. Pro. No. 20-ap** |
| **Plaintiff,** | |
| **vs.** | |

**EXFREIGHT OF FLORIDA, LLC, a Florida**
**limited liability company, EXFREIGHT**
**ZETA, LLC, a Florida limited liability**
**company, DACACO HOLDINGS, LLC, and**
**Florida limited liability company, and**
**STEPHEN HUNTLEY, an individual,**

**Defendants.**

_____/

## COMPLAINT

Plaintiff, Alex D. Moglia (the "Trustee" or "Plaintiff"), as the Chapter 11 Trustee for the above-captioned Debtor, IPS Worldwide, LLC ("IPS"), hereby sues Defendants, Exfreight of Florida, LLC ("EOF"), a Florida limited liability company, Exfreight Zeta, LLC ("Zeta"), a Florida limited liability company, DACACO Holdings, LLC ("DACACO"), a Florida limited liability company, and Stephen Huntley ("Huntley"), an individual, (collectively, the "Defendants") and alleges, upon information and belief, as follows:

**Nature of the Action**

1.      This is an adversary proceeding brought pursuant to Sections 544 and 550 of Title

11 of the United States Code (the "Bankruptcy Code"), Chapter 726, Florida Statutes, and Rule 7001

of the Federal Rules of Bankruptcy Procedure, seeking to avoid actual and constructively fraudulent

conveyances, and obtain a declaratory judgment as to the ownership and member rights of EOF.

**Jurisdiction and Venue**

2.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28

U.S.C. §§ 1334 and 157.

3.      Venue is proper in this district under 28 U.S.C. § 1409.

4.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

**Procedural and Factual Background**

5.      On January 25, 2019 ("Petition Date"), IPS filed a voluntary petition for

reorganization under Chapter 11 of the Bankruptcy Code.

6.      Alex D. Moglia was appointed Trustee in this Chapter 11 case on or about April

5, 2019.

7.      IPS is a Florida limited liability company formed on or about June 25, 1998.  IPS

provided global freight payment industry services, including, freight audit and payment solutions,

logistics and carrier contract management, as well as North American and International

transportation management. Prior to the appointment of the Trustee, William Davies was the

manager of IPS.

8.    Defendant, EOF is a Florida limited liability company with a principal place of business is located at 2290 10th Avenue, Suite 501, Lake Worth, Florida. The managers of EOF are DACACO, Charles Marrale, and Huntley.

9.    Defendant, Zeta is a Florida limited liability company with a principal place of business located at 2290 10th Avenue, Suite 501, Lake Worth, Florida. Charles Marrale is the managing member. On or about January 29, 2018, Zeta was formed by the conversion of Exfreight Zeta, Inc., an Ontario Canada corporation, which was qualified to transact business in Florida on or about July 2008. Charles Marrale is the director.

10.    Defendant, DACACO is a Florida limited liability company with a principal address of 149 S. Ridgewood Avenue, Suite 700, Daytona Beach, Florida. William Davies is the manager of DACACO.

11.    Defendant Huntley is an individual with an address of 3301 N. University Drive, Suite 425, Coral Springs, Florida. Huntley claims an ownership interest in EOF.

<u>THE TRANSACTION AND FRAUDULENT TRANSFERS</u>

12.    Prior to the Petition Date, Huntley introduced Charles Marrale, an equity holder of Zeta, to William Davies, the manager and equity holder of DACACO and IPS. Zeta needed an infusion of capital to pay off existing liabilities, and DACACO was interested in acquiring an interest in Zeta's business.

13.    On January 26, 2016, EOF, DACACO, Zeta, William Davies, Charles Marrale and Huntley executed an Amended and Restated Limited Company Operating Agreement of Exfreight of Florida LLC (the "EOF Operating Agreement"). A copy of the EOF Operating Agreement is

attached hereto as **Exhibit "A"** and is incorporated herein by reference. Pursuant to the terms of the EOF Operating Agreement, DACACO was to loan EOF $1,250,000.00 (the "EOF Loan") which would be used to: (i) buy out all equity owners in Zeta other than Charles Marrale ($200,000); and (ii) pay off and satisfy its existing factoring liability in its entirety ($750,000). In exchange for the EOF Loan, DACACO would become a 48.5% member in EOF (the "DACACO Membership Interest").

14.    Pursuant to the terms of the EOF Operating Agreement, Zeta was to transfer to EOF, as a capital contribution in exchange for a 46.5% membership interest, each and every asset that it owns, possesses, or has carried on its balance sheet, whether intangible personal property or tangible personal property, including but not limited to, the following assets: (i) all of its regulatory licenses, including but not limited to (A) its Federal Maritime Commission (FMC) license, (B) its TSA license, and (C) its IATA license; (ii) its pricing agreements with all current carriers; (iii) all of its accounts receivable (in the approximate amount of $1,100,000.00 USD), (iv) that certain patent pending titled Process of Combining Multiple Carriers for International Shipping, U.S. Patent Application No. 14/309,147t, (v) its shipping transaction management software, and (vi) all rights, benefits, and privileges under **each of the contracts listed on Schedule 3.2 (d) attached hereto [need to address]** and by this reference incorporated herein." However, after the EOF Operating Agreement was signed, the parties learned, that Zeta could not transfer its regulatory licenses, TSA License, IATA License, credit history and pricing agreements to EOF.

15.     In addition, as part of the overall transaction and pursuant to the EOF Operating Agreement, Huntley would receive a 5% membership interest in EOF in exchange for introducing Zeta and DACACO (the "Huntley Membership Interest").

16.     Although DACACO was required to fund the Loan, on January 26, 2016, IPS transferred $905,796.85 to EOF, and on February 10, 2016, IPS transferred an additional $150,000 to EOF (the "EOF Fraudulent Transfers"). IPS was not a party to the EOF Operating Agreement, did not receive a membership interest in EOF in exchange for the EOF Fraudulent Transfers, and IPS was under no obligation to fund the Loan. A copy of the bank statements reflecting the receipt of the Fraudulent Transfers is attached hereto as **Exhibit "B"** and is incorporated herein by reference.

17.     The EOF Fraudulent Transfers were subsequently transferred from EOF to Zeta. EOF received no fair consideration from Zeta in exchange for the EOF Fraudulent Transfers.

<u>EOF Operating Agreement and Missing Material Terms</u>

18.     The EOF Operating Agreement is missing several material terms, and some of those material terms require acts which are legally impossible for Zeta to perform.

19.     As mentioned in paragraph 15 of this complaint, Schedule 3.2(d) was never created and it stated it needed to be addressed. This was a material term which was not finalized in the EOF Operating Agreement. As such, the parties have no knowledge as to what contracts were to be transferred by Zeta to EOF.

20.     Pursuant to page 5 Section (e) of the EOF Operating Agreement:

Exfreight Zeta represents and warrants that it has all right, title and interest to all of the assets described in Section 3.2(d) above and that - **except for those liabilities listed on Schedule 3.2(f) attached hereto [need to address]** and by this reference

incorporated herein - all such assets are free and clear of any encumbrances, claims, liens, options or other rights held by any third party.

21.    Pursuant to page 5 Section (f) of the EOF Operating Agreement, "[e]ach Member represents and warrants that - **except for those liabilities listed on Schedule 3.2(f) attached hereto** and by this reference incorporated herein - the Company has not assumed, or otherwise become liable for, any liabilities of any Member."

22.    Pursuant to page 5 Section (h) of the EOF Operating Agreement:

Exfreight Zeta represents and warrants (i) that the liabilities **set forth on Schedule 3.2(f)** include no more than Two Hundred Thousand US Dollars ($200,000.00 USD) to completely buy out all equity owners in Exfreight Zeta other than Charles Marrale, and (ii) that the **liabilities set forth on Schedule 3.2 (f)** include Seven Hundred Fifty Thousand US Dollars ($750,000.00 USD) to pay off and satisfy its existing factoring liability in its entirety.

23.    Schedule 3.2 (f) was never created and the EOF Operating Agreement stated it needed to be address. As such, the parties have no knowledge as to what assets were transferred subject to preexisting liabilities and what liabilities were assumed by EOF. This was a material term which was not finalized in the EOF Operating Agreement.

24.    Pursuant to page 24-25, Section 10.1 of the EOF Operating Agreement:

Cash Distributions. Contrary to Section 605.0404(1) of the Revised Act, and except as otherwise provided in Article XI hereof, the Company shall make cash distributions, at such times and in such aggregate amounts as the Manager shall determine in its sole and absolute discretion, pro rata amount the Profits Sharing Unit Holders. Notwithstanding the preceding sentence to the contrary, cash distributions by the Company to the Profit Sharing Unit Holders shall never be less frequent than annually, and at or before the delivery of tax information required by Section 12.3 of this Agreement, and the aggregate (i.e. for all Profit Sharing Unit Holders) **annual amount of which never be less than_____% [Garrett to provide this number]** of the amount of the total taxable income of the Company for the Company's preceding Fiscal Year (as shown on its federal income tax return).

25.    As mentioned in paragraph 29 of this complaint Section 10.1 of the EOF Operating Agreement, it was never finalized for the cash distributions of the profits. This was another material term of the EOF Operating Agreement which was never finalized.

26.    Pursuant to page 5 Section (g) of the EOF Operating Agreement, "DACACO represents and warrants that is has made a loan to the Company in the amount of One Million Two Hundred Fifty Thousand US Dollars ($1,250,000.00 USD), on commercially customary terms, including an interest rate of six percent (6%) per annum." However, DACACO did not provide the Loan to EOF. IPS transferred the EOF Fraudulent Transfers to EOF, but this amount is $194,203.15 less than the Loan amount.

27.    The parties have failed to comply with the terms and conditions of the EOF Operating Agreement. Based upon the failure to transfer the Loan proceeds and the assets to EOF, the parties are unsure of their rights and obligations in and to EOF.

## COUNT I.
## DECLARATORY JUDGMENT AS TO IPS AND
## DEFENDANTS EOF, DACACO, ZETA AND HUNTLEY

28.    Paragraphs 1 through 27 inclusive are realleged and incorporated herein by reference.

29.    This is an adversary proceeding to obtain a declaratory judgment with respect to the rights, obligations and formation of EOF.

30.    There is currently doubt as to the existence or nonexistence of interest in EOF by DACACO, IPS, Zeta and Huntley.

31.    A declaratory judgment relief is proper where litigation seems unavoidable.

32.     This request for the declaratory judgment is not being used to satisfy idle curiosity or to answer abstract questions.

33.     There is a bona fide, actual, present, and practical need for the declaration sought.

34.     DACACO did not perform under the EOF Operating Agreement as it did not fund the Loan pursuant to the EOF Operating Agreement. However, IPS did transfer the EOF Fraudulent Transfers, as part of the Loan to EOF, for the benefit of DACACO, EOF, Zeta and Huntley.

35.     Prior to the Petition Date, DACACO, Huntley and Zeta recognized it was impossible for Zeta to perform under the EOF Operating Agreement.

36.     Neither DACACO nor Zeta performed under the terms of the EOF Operating Agreement.

37.     The Plaintiff is seeking a declaratory judgment that the EOF Operating Agreement is not binding as material terms were left out of the agreement as there was no meeting of the minds, the impossibility of performance by Zeta, and DACACO's failure to fund the Loan pursuant to the EOF Operating Agreement.

**WHEREFORE,** Alex D. Moglia , as Chapter 11 Trustee, requests that this Court enter a declaratory judgment: (i) determining the EOF Operating Agreement is void; (ii) determining what, if any, membership interests IPS has in Exfreight of Florida, LLC;  (iii) determining DACACO Holdings, LLC does not have any membership interests in Exfreight of Florida, LLC; (iv) determining Stephen Huntley does not have any membership interests in Exfreight of Florida, LLC; and (v)  for such other and further relief as this Court deems just and proper.

## COUNT II.
## (CONSTRUCTIVE FRAUD)
## FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT EOF
## UNDER 11 U.S.C. §§544(b) AND 550,
## AND FLA. STAT. §§726.105(1)(b), 726.106(1), and 726.108

38.     Paragraphs 1 through 37 inclusive are realleged and incorporated herein by reference.

39.     This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C.

§§544(b) and 550, and Fla. Stat. §726.101 *et seq.*

40.     Within four years prior to the Petition Date, IPS transferred, to or for the benefit of

EOF, the EOF Fraudulent Transfers.

41.     IPS received no fair consideration in exchange for the EOF Fraudulent Transfers.

42.     IPS was insolvent on the dates of the EOF Fraudulent Transfers and remained

insolvent continuously thereafter.

43.     At the time of the EOF Fraudulent Transfers, IPS was engaged in a business or

transaction for which the remaining property of IPS constituted an unreasonably small amount of

capital in relation to the business or transaction.

44.     At the time of the EOF Fraudulent Transfers, IPS intended to incur, believed or

reasonably should have believed that it would incur, debts that would be beyond IPS's ability to pay

as they became due.

45.     There is at least one actual holder of an allowed unsecured claim pursuant to 11

U.S.C. §502, who would have standing to assert a claim for relief under the Florida Uniform

Fraudulent Transfer Act ("FUFTA").

46.     The EOF Fraudulent Transfers are avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

47.     Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of IPS's estate is authorized to the extent the EOF Fraudulent Transfers are avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE,** Alex D. Moglia, as Chapter 11 Trustee, requests that this Court enter a judgment against Exfreight of Florida, LLC: (i) avoiding the EOF Fraudulent Transfers pursuant to 11 U.S.C. §544(b) and Fla. Stat. §§726.105(1)(b), 726.106(1), and 726.108; (ii) recovering the value of the EOF Fraudulent Transfers from Exfreight of Florida, LLC pursuant to 11 U.S.C. §550; (iii) granting interest from the date of the EOF Fraudulent Transfers; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

**COUNT III.**
**(ACTUAL FRAUD)**
**FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT EOF**
**UNDER 11 U.S.C. §§544(b) AND 550,**
**AND FLA. STAT. §§726.105(1)(a) and 726.108**

48.     Paragraphs 1 through 37 inclusive are realleged and incorporated herein by reference.

49.     This is an adversary proceeding to recover actual fraudulent transfers pursuant to 11 U.S.C. §§544(b) and 550, and Fla. Stat. §726.101, et. seq.

50.     Within four years prior to the Petition Date, IPS transferred, to or for the benefit of EOF, the EOF Fraudulent Transfers.

51.     The EOF Fraudulent Transfers were made by IPS with the actual intent to hinder, delay or defraud present and future creditors of IPS.

52.    There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under FUFTA.

53.    The EOF Fraudulent Transfers are avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

54.    Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of IPS's estate is authorized to the extent the EOF Fraudulent Transfers are avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE,** Alex D. Moglia, as Chapter 11 Trustee, requests that this Court enter a judgment against Exfreight of Florida, LLC: (i) avoiding the EOF Fraudulent Transfers pursuant to 11 U.S.C. §544(b) and Fla. Stat. §726.105(1)(a); (ii) recovering the value of the EOF Fraudulent Transfers from Exfreight of Florida, LLC pursuant to 11 U.S.C. §550; (iii) granting interest from the date of the EOF Fraudulent Transfers; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

### COUNT IV.
### (CONSTRUCTIVE FRAUD)
### FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT DACACO
### UNDER 11 U.S.C. §§544(b) AND 550,
### AND FLA. STAT. §§726.105(1)(b), 726.106(1), and 726.108

55.    Paragraphs 1 through 37 inclusive are realleged and incorporated herein by reference.

56.    This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§544(b) and 550, and Fla. Stat. §726.101 *et seq.*

57.     Within four years prior to the Petition Date, IPS transferred, to or for the benefit of DACACO, the EOF Fraudulent Transfers.  In addition, as part of the overall transaction, DACACO also received the DACACO Membership Interest.

58.     IPS received no fair consideration in exchange for the EOF Fraudulent Transfers or the DACACO Membership Interest.

59.     IPS was insolvent on the dates of the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest, and remained insolvent continuously thereafter.

60.     At the time of the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest, IPS was engaged in a business or transaction for which the remaining property of IPS constituted an unreasonably small amount of capital in relation to the business or transaction.

61.     At the time of the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest, IPS intended to incur, believed or reasonably should have believed that it would incur, debts that would be beyond IPS's ability to pay as they became due.

62.     There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under FUFTA.

63.     The EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest are avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

64.     Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of IPS's estate is authorized to the extent the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest are avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE,** Alex D. Moglia, as Chapter 11 Trustee, requests that this Court enter a judgment against DACACO Holdings, LLC: (i) avoiding the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest pursuant to 11 U.S.C. §544(b) and Fla. Stat. §§726.105(1)(b), 726.106(1), and 726.108; (ii) recovering the value of the EOF Fraudulent Transfers and the DACACO Membership Interest from DACACO Holdings, LLC pursuant to 11 U.S.C. §550; (iii) granting interest from the date of the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

**COUNT V.**
**(ACTUAL FRAUD)**
**FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT DACACO**
**UNDER 11 U.S.C. §§544(b) AND 550,**
**AND FLA. STAT. §§726.105(1)(a) and 726.108**

65.    Paragraphs 1 through 37 inclusive are realleged and incorporated herein by reference.

66.    This is an adversary proceeding to recover actual fraudulent transfers pursuant to 11 U.S.C. §§544(b) and 550, and Fla. Stat. §726.101, et. seq.

67.    Within four years prior to the Petition Date, IPS transferred, to or for the benefit of DACACO, the EOF Fraudulent Transfers. In addition, as part of the overall transaction, DACACO also received the DACACO Membership Interest.

68.    The EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest were made by IPS with the actual intent to hinder, delay or defraud present and future creditors of IPS.

69.     There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under FUFTA.

70.     The EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest are avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

71.     Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of IPS's estate is authorized to the extent the EOF Fraudulent Transfers and the transfer of the DACACO Membership are avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE,** Alex D. Moglia, as Chapter 11 Trustee, requests that this Court enter a judgment against DACACO Holdings, LLC: (i) avoiding the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest pursuant to 11 U.S.C. §544(b) and Fla. Stat. §726.105(1)(a); (ii) recovering the value of the EOF Fraudulent Transfers and the DACACO Membership Interest from DACACO Holdings, LLC pursuant to 11 U.S.C. §550; (iii) granting interest from the date of the EOF Fraudulent Transfers and the transfer of the DACACO Membership Interest; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

**COUNT VI.**
**(CONSTRUCTIVE FRAUD)**
**FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT HUNTLEY**
**UNDER 11 U.S.C. §§544(b) AND 550,**
**AND FLA. STAT. §§726.105(1)(b), 726.106(1), and 726.108**

72.     Paragraphs 1 through 37 inclusive are realleged and incorporated herein by reference.

73.     This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§544(b) and 550, and Fla. Stat. §726.101 *et seq.*

74.     Within four years prior to the Petition Date, IPS transferred, to or for the benefit of Huntley, the EOF Fraudulent Transfers.  In addition, as part of the overall transaction, Huntley also received the Huntley Membership Interest.

75.     IPS received no fair consideration in exchange for the EOF Fraudulent Transfers or the Huntley Membership Interest.

76.     IPS was insolvent on the dates of the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest, and remained insolvent continuously thereafter.

77.     At the time of the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest, IPS was engaged in a business or transaction for which the remaining property of IPS constituted an unreasonably small amount of capital in relation to the business or transaction.

78.     At the time of the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest, IPS intended to incur, believed or reasonably should have believed that it would incur, debts that would be beyond IPS's ability to pay as they became due.

79.     There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under FUFTA.

80.     The EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest are avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

81.     Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of IPS's estate is authorized to the extent the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest are avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE,** Alex D. Moglia, as Chapter 11 Trustee, requests that this Court enter a judgment against Stephen Huntley: (i) avoiding the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest pursuant to 11 U.S.C. §544(b) and Fla. Stat. §§726.105(1)(b), 726.106(1), and 726.108; (ii) recovering the value of the EOF Fraudulent Transfers and the Huntley Membership Interest from Stephen Huntley pursuant to 11 U.S.C. §550; (iii) granting interest from the date of the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

### COUNT VII.
### (ACTUAL FRAUD)
### FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT HUNTLEY
### UNDER 11 U.S.C. §§544(b) AND 550,
### AND FLA. STAT. §§726.105(1)(a) and 726.108

82.    Paragraphs 1 through 37 inclusive are realleged and incorporated herein by reference.

83.    This is an adversary proceeding to recover actual fraudulent transfers pursuant to 11 U.S.C. §§544(b) and 550, and Fla. Stat. §726.101, et. seq.

84.    Within four years prior to the Petition Date, IPS transferred, to or for the benefit of Huntley, the EOF Fraudulent Transfers. In addition, as part of the overall transaction, Huntley also received the Huntley Membership Interest.

85.    The EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest were made by IPS with the actual intent to hinder, delay or defraud present and future creditors of IPS.

86.    There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under FUFTA.

87.    The EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest are avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

88.    Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of IPS's estate is authorized to the extent the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest are avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE,** Alex D. Moglia, as Chapter 11 Trustee, requests that this Court enter a judgment against Stephen Huntley: (i) avoiding the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest pursuant to 11 U.S.C. §544(b) and Fla. Stat. §726.105(1)(a); (ii) recovering the value of the EOF Fraudulent Transfers and the Huntley Membership Interest from Stephen Huntley pursuant to 11 U.S.C. §550; (iii) granting interest from the date of the EOF Fraudulent Transfers and the transfer of the Huntley Membership Interest; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

## COUNT VIII.
### LIABILITY OF DEFENDANT ZETA FOR AVOIDED FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§554(b) AND 550(a)(2), AND FLA. STAT. §§726.105(1)(a) AND (b), 726.106(1), AND 726.108

89.    Paragraphs 1 through 37 inclusive are realleged and incorporated herein by reference.

90.    This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §550(a)(2) from Defendant Zeta as the immediate or mediate transferee of EOF.

91.    Within four years prior to the Petition Date, EOF, the initial transferee, transferred the EOF Fraudulent Transfers to or for the benefit of Zeta.

92.    To the extent that the EOF Fraudulent Transfers are avoided in Counts II, III, IV, V, VI, and VII, Zeta as an immediate or mediate transferee of the avoided transfers is liable to the estate for the value of the EOF Fraudulent Transfers.

93.    The EOF Fraudulent Transfers were made by IPS with the actual intent to hinder, delay or defraud present and future creditors of IPS.

94.    IPS received no fair consideration in exchange for the EOF Fraudulent Transfers or for the execution of the EOF Operating Agreement.

95.    IPS was insolvent on the dates of the EOF Fraudulent Transfers and on the date the EOF Operating Agreement was executed, and remained insolvent continuously thereafter.

96.    At the time of the EOF Fraudulent Transfers and the execution of the EOF Operating Agreement, IPS was engaged in a business or transaction for which the remaining property of IPS constituted an unreasonably small amount of capital in relation to the business or transaction.

97.    At the time of the EOF Fraudulent Transfers and the execution of the EOF Operating Agreement, IPS intended to incur, believed or reasonably should have believed that it would incur, debts that would be beyond IPS's ability to pay as they became due.

98.    Zeta did not take the EOF Fraudulent Transfers for value and in good faith, or without knowledge of the voidability of the transfer.

99.    There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under FUFTA.

100.    The EOF Fraudulent Transfers are avoidable under Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a), and 11 U.S.C. §544(b).

101.    Pursuant to 11 U.S.C. § 550(a), the recovery of property for the benefit of IPS's estate is authorized to the extent the EOF Fraudulent Transfers are avoided under 11 U.S.C. § 544(b) and FUFTA.

**WHEREFORE,** Alex D. Moglia, as Chapter 11 Trustee, requests that this Court enter a judgment against Exfreight Zeta, LLC; (i) recovering the value of the EOF Fraudulent Transfers from Exfreight Zeta, LLC pursuant to 11 U.S.C. § 550; (ii) granting interest from the date of the EOF Fraudulent Transfers; (iii) granting all costs from this action; and (iv) for such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED**, this day of February, 2020.

R. Scott Shuker, Esquire
Florida Bar No.984469
Mariane L. Dorris, Esquire
Florida Bar No. 0173665
**SHUKER & DORRIS, P.A.**
121 S. Orange Avenue, Suite 1120
Orlando, Florida 32801
Tel: 407-337-2060
Fax: 407-337-2050
Attorneys for Alex D. Moglia, Trustee for the
Bankruptcy Estate of IPS Worldwide, LLC

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**EXFREIGHT OF FLORIDA, LLC**

This Amended and Restated Limited Liability Company Operating Agreement (this "Agreement") of **EXFREIGHT OF FLORIDA, LLC,** a Florida limited liability company (the "Company") is entered into and effective as of the 26th day of January, 2016 (the "Effective Date"), by and among **DACACO HOLDINGS, LLC,** a Florida limited liability company ("DACACO"), **EXFREIGHT ZETA, INC.,** an Ontario Canada corporation qualified to transact business in Florida ("Exfreight Zeta"), and Steven T. Huntley ("Huntley") (hereinafter individually referred to as "Member" or collectively as the "Members"). This Agreement hereby replaces that certain Operating Agreement of Exfreight of Florida, LLC entered into by DACACO and Exfreight Zeta on January 26, 2016. Pursuant to and in accordance with the Florida Revised Limited Liability Company Act, Chapter 605, Florida Statutes (2016) (the "Revised Act"), the Members enter into this Agreement on the following terms and conditions:

## ARTICLE I. BACKGROUND OF THIS AGREEMENT

**SECTION 1.1.** **History of the Company.** The Company was formed and organized in Florida on August 31, 2015. The Company's Articles of Organization were filed with, and accepted by, the Florida Department of State on August 31, 2015. The Company's Amended and Restated Articles of Organization were filed with, and accepted by, the Florida Department of State on January 7, 2016. The Company shall be a multi-member limited liability company that is treated, for all federal tax purposes, as a partnership. DACACO is specifically authorized to act as the "Tax Matters Member" under the Internal Revenue Code and the regulations that are promulgated thereunder, and in any similar capacity under state or local law.

**SECTION 1.2.** **Principal Place of Business.**

As of the Effective Date, the Company's principal place of business is 2290 10th Avenue, Suite 501, Lake Worth, Florida 33461.

**SECTION 1.3.** **Intent of This Agreement.**

(a)    The parties to this Agreement have reached an understanding concerning various aspects of (i) their business relationship with each other and (ii) the organization and operation of the Company and its business. They wish to use rights created by statute to record and bind themselves to that understanding.

(b) The parties intend for this Agreement, to the extent stated or fairly implied, to control the business and affairs of the Company, including the Company's governance structure and the Company's dissolution, winding up, and termination, as well as the relations among the Company's Members.

**SECTION 1.4. Invalidity and Unreasonableness of Expectations Not Included in This Agreement.**

(a)    The Members desire to avoid the uncertainty and the potential for discord that would exist if:

(i) the unstated expectation of one or more Members could be used to gain advantage through litigation, or

(ii) expectations stated or expressed outside the confines of this Agreement could become actionable even though not all Members agreed with those expectations, or had assented to them, and even though some Members had expressed or might harbor conflicting expectations.

(b) The Members therefore agree:

(i) that it is unreasonable for any Member to have, or to rely on, an expectation that is not reflected in this Agreement;

(ii) that any Member who has or develops an expectation contrary to, or in addition to, the contents of this Agreement has a duty to

(A) immediately inform the Manager and all other Members of such expectation, and

(B) promptly seek to have this Agreement amended to reflect such expectation;

(iii) that the failure of a Member who has or develops an expectation contrary to or in addition to the contents of this Agreement to obtain an amendment of this Agreement as provided in Section 1.4(b)(ii)(B) is evidence that such expectation was not reasonable, and it estops that Member from asserting such expectation as a basis for any claim against the Company or any other Member; and

(iv) that no Member has a duty to agree to an amendment proposed under Section 1.4(b)(ii)(B) if that Member, in good faith,

(A) holds an inconsistent expectation, or

2

(B) believes that the amendment is not in the best interests of the Company or is contrary to the legitimate self-interests of that Member.

SECTION 1.5. **Advice of Counsel.** Each Person who has signed this Agreement:

(a) understands that this Agreement contains legally binding provisions,

(b) has had the opportunity to consult with a lawyer, and

(c) either has consulted with a lawyer or has consciously decided not to consult a lawyer.

ARTICLE II. RELATIONSHIP OF THIS AGREEMENT TO THE DEFAULT RULES UNDER THE REVISED ACT AND TO THE ARTICLES OF ORGANIZATION.

SECTION 2.1. **Relationship of This Agreement to the Default Rules Under the Revised Act.** Regardless of whether this Agreement specifically refers to any particular Default Rule:

(a) if any provision of this Agreement conflicts with a Default Rule, that provision of this Agreement shall control, and the Default Rule shall be modified or negated accordingly, and

(b) if it is necessary, in order to effectuate any provision of this Agreement, to construe a Default Rule as having been modified or negated by this Agreement, the Default Rule shall be considered to have been modified or negated accordingly.

SECTION 2.2. **Relationship of This Agreement to the Articles of Organization.** If a provision of this Agreement differs from a provision of the Company's Articles of Organization, as they may be amended or restated from time to time, this Agreement shall govern to the full extent allowed by the Revised Act.

ARTICLE III. REPRESENTATIONS AND WARRANTIES

SECTION 3.1. **In General.** As of the Effective Date, and of all times thereafter, each of the Members hereby makes each of the representations and warranties applicable to such Member as set forth in Section 3.2 hereof, and all of such warranties and representations shall survive the execution of this Agreement.

SECTION 3.2. **Representations and Warranties.** Each Member hereby represents and warrants that:

(a) **Due Incorporation or Formation; Authorization of Agreement.** If applicable, such Member is duly organized or duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate or

3

partnership or company power and authority to own its property and carry on. Such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership or company action. This Agreement constitutes the legal, valid, and binding obligation of such Member.

(b) **No Conflict with Restrictions; No Default.** Neither the execution, delivery, or performance of this Agreement nor the consummation by such Member of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator applicable to such Member or any of its Wholly Owned Affiliates, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, or operating agreement of such Member or any of its Wholly Owned Affiliates if such Member is a corporation, partnership, or limited liability company, or of any material agreement or instrument to which such Member or any of its Wholly Owned Affiliates is a party or by which such Member or any of its Wholly Owned Affiliates is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member or any of its Wholly Owned Affiliates is a party or by which such Member or any of its Wholly Owned Affiliates is or may be bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member or any of its Wholly Owned Affiliates.

(c)    The Company's fictitious name and service mark (whether Florida-registered or otherwise) will be simply "Exfreight". Each of DACACO, Exfreight Zeta, and Huntley represents and warrants that he or it will not use such fictitious name or such service mark.

4

This business operation is entitled to use the name "Exfreight", derivations thereof, and variations thereon, and each Member shall not take any action that might terminate or diminish that entitlement.

(d)    Exfreight Zeta represents and warrants that it has transferred to the Company, as a contribution to capital, each and every asset that it owns, possesses, or has carried on its balance sheet, whether intangible personal property or tangible personal property, including but not limited to, the following assets: (i) all of its regulatory licenses, including but not limited to (A) its Federal Maritime Commission (FMC) license, (B) its TSA license, and (C) its IATA license; (ii) its pricing agreements with all current carriers; (iii) all of its accounts receivable (in the approximate amount of $1,100,000.00 USD), (iv) that certain patent pending titled *Process of Combining Multiple Carriers for International Shipping*, U.S. Patent Application No. 14/309,147t, (v) its shipping transaction management software, and (vi) all rights, benefits, and privileges under **each of the contracts listed on Schedule 3.2 (d) attached hereto [need to address]** and by this reference incorporated herein.

(e)    Exfreight Zeta represents and warrants that it has all right, title and interest to all of the assets described in Section 3.2 (d) above and that – except for **those liabilities listed on Schedule 3.2 (f) attached hereto [need to address]** and by this reference incorporated herein – all such assets are free and clear of any encumbrances, claims, liens, options or other rights held by any third party.

(f)    Each Member represents and warrants that – except for those liabilities listed on Schedule 3.2 (f) attached hereto and by this reference incorporated herein – the Company has not assumed, or otherwise become liable for, any liabilities of any Member.

(g)    DACACO represents and warrants that it has made a loan to the Company in the amount of One Million Two Hundred Fifty Thousand US Dollars ($1,250,000.00 USD), on commercially customary terms, including an interest rate of six percent (6%) per annum.

(h)    Exfreight Zeta represents and warrants (i) that the liabilities set forth on Schedule 3.2 (f) include no more than Two Hundred Thousand US Dollars ($200,000.00 USD) to completely buy out all equity owners in Exfreight Zeta other than Charles Marrale, and (ii) that the liabilities set forth on Schedule 3.2 (f) include Seven Hundred Fifty Thousand US Dollars ($750,000.00 USD) to pay off and satisfy its existing factoring liability in its entirety.

(i)    The Company will have the authority to form a wholly-owned subsidiary for the purpose of engaging in a software business that is separate and apart from the businesses in which the Company is engaged.

SECTION 3.3.  Breach of Representation or Warranty.  A breach of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there ever is, on or after the Effective Date, (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach", as used in this Agreement, means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

SECTION 3.4.  Remedy for Breach.  Each Member, Manager, and officer (collectively, the "Indemnifiers") shall indemnify and hold harmless each and every other party to this Agreement (collectively, the "Indemnified Persons") for, and will pay to each Indemnified Person the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages") that was sustained by that Indemnified Person and that arose, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by that Indemnifier; or (b) any Breach by that Indemnifier of any covenant or obligation in this Agreement.

ARTICLE  IV.    RESTRICTIONS  AGAINST  COMPETITION,  SOLICITATION, SERVICING, AND REVEALING CONFIDENTIAL DATA.

SECTION 4.1.  Covenant Not to Compete.  As a material inducement to the other parties hereto entering into this Agreement, each Member, each Manager, and each officer agrees not to Compete (as defined in Article XIV) with the Company, or to allow any other Members, Managers, or officers to do so, for so long as it or he is a Member, a Manager, or an officer plus the five (5) year period beginning on the date on which it or he ceases to be a Member, a Manager, or an officer.

SECTION 4.2.  Covenant Not to Solicit or Service.  The parties recognize that the Company has spent significant amounts of time and money developing a list of its customers, which list is not available to the general public, and that this list contains other information about

6

the customers not available to the general public, and that the Members, Managers, and officers may become privileged to this list. The parties also acknowledge that many of the customers on this list do not have an advertised place of business, that the Company's competitors could not recreate this list without substantial efforts, and that the Company's business would be irreparably and greatly damaged by the use of this information other than for its benefit. Furthermore, the Company has spent significant amounts of time and money training and developing its employees and its workforce in place. Therefore, as a material inducement to the other parties hereto entering into this Agreement, each Member, each Manager, and each officer agrees that it or he shall not solicit or do business with, or attempt to solicit or do business with, any of the Company's customers or employees, or allow any Member, Manager or officer to do so -- except on the Company's behalf for so long as, if at all, it or he is a Member, Manager or officer of the Company – from and after the Effective Date through and including the three (3) year period beginning on the date on which it or he ceases to be a Member, a Manager, or an officer.

SECTION 4.3. **Covenant Not to Violate Company Confidences.** The Members, Managers, and officers will have access to, and will become aware of, confidential information and trade secrets including Customer data, files, and business techniques not generally available to the public. This confidential information has been compiled by the Company at great expense and over a great amount of time. The parties acknowledge that this confidential information gives the Company a competitive advantage over other businesses in its field of endeavor and that the Company's business shall be greatly and irreparably damaged by the release or use of this confidential information outside of its own business. Therefore, as a material inducement to the other parties hereto entering into this Agreement, each Member, each Manager, and each officer agrees that it or he shall not, from and after the Effective Date through and including the three (3) year period beginning on the date on which it or he ceases to be a Member, a Manager, or an officer, disclose or divulge this confidential information to anyone or use this confidential information in any manner to Compete with the Company.

SECTION 4.4. **Enforcement.** The Company may enforce the provisions of this Article IV by suit for damages, by injunction, or by both.

(a)    The Company would be irreparably injured by the breach of any provision of this Article IV, and money damages alone would not be a sufficient measure of the harm to the Company from such continuing breach. Therefore, equitable relief, including specific performance

7

of these provisions by injunction, would be an appropriate remedy for the breach of these provisions.

    **(b)**    Money damages shall be appropriate with respect to any past breach of any provision of this Article IV. Therefore, in case of any breach of this Article IV, the breaching party shall render a full and complete accounting of the gross receipts, expenses, and net profits that have resulted from such breach and shall be liable for money damages equal to fifty percent (50%) of the gross amount derived by such breaching party from all transactions in breach of this section, such amount representing the amount of profit the Company could have derived from its own transaction of such business.

    **(c)**    Should a court of competent jurisdiction determine that equitable relief is not available to remedy the continuous breach of any or all of the provisions of this Article IV, an amount of liquidated damages shall be paid to the Company by the breaching party equal to an additional fifty percent (50%) of the gross amount derived by such breaching party from all transactions in breach of this section, such amount representing the amount of profit the Company could have derived from its own transaction of such business.

## ARTICLE V. TRANSFERS OF UNITS

    **SECTION 5.1.**  <u>Restriction on Transfers</u>. Except as otherwise permitted by this Agreement, no Unit Holder shall Transfer all or any portion of its Units. In the event that any Unit Holder pledges or otherwise encumbers any of its Units as security for the payment of a Debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this Article V.

    **SECTION 5.2.** <u>Permitted Transfers</u>. Subject to the conditions precedent and restrictions set forth in Section 5.3 hereof, a Unit Holder may Transfer at any time all or any portion of its Units. (Any Transfer of such Units satisfying such conditions precedent and restrictions is referred to herein as a "Permitted Transfer".)

    **SECTION 5.3.** <u>Conditions Precedent to Permitted Transfers</u>. A Transfer shall not be treated as a Permitted Transfer unless and until all of the following conditions are satisfied:

    (a)    **Right of First Refusal in, first, the Company and, then, the Members.**

        i.    No Member shall sell, transfer, or otherwise dispose of all or any portion of its Profit Sharing Units without first offering such Profit Sharing Units for sale to the

Company (A) in a writing, (B) that is signed by the selling Profit Sharing Unit Holder, (C) that is sent via hand-delivery, registered or certified mail to the Managers of the Company, (D) that states the number of Profit Sharing Units desired to be sold, (E) that states the purchase price per Profit Sharing Unit for which the Profit Sharing Units will be sold, (F) that offers to sell such Profit Sharing Units in accordance with the terms of this Section 5.3(a), and (G) that remains open for acceptance for a period of thirty (30) days after the date of receipt ("Bona Fide Offer").

    ii.  If the Company does not exercise its option to purchase all, but not less than all, of the Profit Sharing Units, as described above, the other Member shall have sixty (60) days after such notification during which to elect to buy the Profit Sharing Units offered for sale.

    iii.  If the other Member desires to exercise its option to purchase all of the Profit Sharing Units offered for sale, it shall notify the selling Member and the Company, in writing within thirty (30) days after the other Member's receipt of such Bona Fide Offer.

    iv.  Closing of the sale either to the Company or to the other Member shall take place at a location of the selling Member's choosing within ninety (90) days after the date the Bona Fide Offer was received either by the Company or the other Member, as the case may be.

    v.  In the event that neither the Company nor the other Member purchases all of the Profit Sharing Units offered for sale as provided above, the selling Member shall be free to sell, transfer or otherwise dispose of the Profit Sharing Units in any manner and upon any terms and conditions; provided, however, that such selling Member shall not in fact sell the Profit Sharing Units to another Person for a price and on terms that are less favorable to the selling Member than the purchase price and other terms set forth in the Bona Fide Offer without first offering the other Member the right to purchase at the same price and upon the same terms as such other Person. In carrying out the intent of the immediately preceding sentence, the Bona Fide Offer procedure specified above shall again be followed except that the notice served upon the other Member shall specify the name and address of the Person to whom the selling Profit Sharing Unit Holder proposes to sell its Profit Sharing Units, the price and terms offered by such seller for such Profit Sharing Units, and a copy of the offer to purchase shall be furnished with the notice. If the other Member shall then fail or refuse to purchase all the Profit Sharing Units for sale at the lesser price offered to such third party, the selling Member shall be free to sell the Profit Sharing

Units on the terms of the offer from the third party within a period of ninety (90) days after the date on which the third party's Bona Fide Offer was delivered to the other Member. After expiration of such ninety (90) day period, the provisions of this Agreement shall reattach to all of the Profit Sharing Units not sold, encumbered or otherwise disposed of during that period.

(b)    Except in the case of a Transfer involuntarily by operation of law, the transferor shall furnish to the Company an opinion of counsel, which counsel and opinion shall be satisfactory to the Company, that the Transfer will not cause the Company to terminate for federal income tax purposes and that such Transfer will not cause the application of the rules of Code Sections 168(g)(1)(B) and 168(h) (generally referred to as the "tax exempt entity leasing rules") or similar rules to apply to the Company, to Company Property, to the Manager, or to the Unit Holders.

(c)    Notwithstanding Section 5.3 above to the contrary, as required by Section 605.0105(3)(i) of the Revised Act, a Unit Holder shall have the power to dissociate as a Member at any time, by withdrawing as a Member by express will. In accordance with Chapter 605.0404(2) of the Revised Act, a Unit Holder's dissociation shall not entitle it to a distribution. A Unit Holder's dissociation as a Member shall be wrongful only if the dissociation (A) is in breach of an express provision of this Agreement, and (B) occurs before completion of the winding up of the Company, and the Unit Holder withdraws as a Member by express will. A Unit Holder who wrongfully dissociates as a Member is liable to the Company and, subject to Section 605.0801 of the Revised Act, to the other Members for damages caused by the dissociation. In accordance with Section 605.0602(1) of the Revised Act, a Unit Holder shall be dissociated as a Member if the Company receives notice of the Unit Holder's express will to withdraw as a Member and that notice specifies a withdrawal date that is no sooner than one hundred eighty (180) days following the Company's receipt of the notice. Article IV of this Agreement in its entirety shall apply to a Unit Holder who disassociates as a Member.

In accordance with Section 605.0603 of the Revised Act, if a Unit Holder is dissociated as a Member (i) the Unit Holder's right to participate as a Member in the management and conduct of the Company's activities and affairs shall terminate, (ii) except in the case of a Permitted Transfer, the Unit Holder shall forfeit and give up, without compensation or remuneration, its entire membership interest, including, but not limited to its Capital Account, Profit Sharing Units and Capital Gains Units, and (iii) subject to Sections 605.0504 and 605.1001-605.1072 of the

Revised Act,, any transferable interest that was owned by the Unit Holder, in its capacity as a Member immediately before dissolution, shall be owned by the transferee thereof, if any, solely as an unadmitted transferee and not as a Member. A Unit Holder's dissolution as a Member does not, of itself, discharge the Unit Holder from any debt, obligation, or other liability to the Company or to the other Members that the Unit Holder incurred while he was a Member.

(d)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number and sufficient information to determine the transferee's initial tax basis in the Units transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Units until it has received such information.

(e)    Except in the case of a Transfer of Units or involuntarily by operation of law, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the other Members, to the effect that such Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940, as amended.

SECTION 5.4.  **Prohibited Transfers.** Any purported Transfer of Units that is not a Permitted Transfer shall be null and void and of no force or effect whatsoever, provided that, if the Company nevertheless should be required to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, should elect to recognize a Transfer that is not a Permitted Transfer), the interest Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Units, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy the debts, obligations, or liabilities for damages that the transferor or transferee of such Units may have to the Company. In the case of a Transfer or attempted Transfer of Units that is not a Permitted Transfer, the Persons engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity that is granted hereby.

11

SECTION 5.5. <u>Rights of Unadmitted Assignees</u>. A Person who acquires one or more Units, but who has not been admitted as a substituted Member pursuant to Section 5.6 hereof, shall be entitled only to allocations and distributions with respect to such Units in accordance with this Agreement, and (i) shall have no right to any information or accounting of the affairs of the Company, (ii) shall not be entitled to inspect the books or records of the Company, and (iii) shall not have any of the rights of a Member under the Revised Act or under this Agreement.

SECTION 5.6. <u>Admission of Assignees as Members</u>. Subject to the other provisions of this Article V, a transferee of Units may be admitted to the Company as a substituted Member only upon satisfaction of the conditions precedent that are set forth below in this Section 5.6:

(a) The Manager consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Manager;

(b) The Units with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer;

(c) The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Manager may reasonably request (including, without limitation, amendments to the Articles of Organization) to confirm such transferee as a Member of the Company and such transferee's agreement to be bound by the terms and conditions hereof;

(d) The transferee pays, or reimburses the Company for, all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the transferred Units;

(e) The transferee provides the Company with evidence that is satisfactory to counsel for the Company that such transferee has made each of the representations and covenants, and has undertaken each of the warranties, that are described in Section 5.7(a) below and that apply to such transferee; and

(f) If the transferee is not an individual of legal majority, the transferee provides the Company with evidence that is satisfactory to counsel for the Company of the authority of the transferee to become a Member and to be bound by the terms and conditions of this Agreement.

SECTION 5.7. <u>Covenants and Representations Regarding Transfers</u>.

Each Unit Holder hereby covenants, represents, and warrants with and to the Company, for the benefit of the Company and of all Unit Holders, that (i) he is not currently making a market in Units, (ii) he will not Transfer any Unit on an established securities market or

a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any Regulations, proposed regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or the Treasury Department that may be promulgated or published thereunder), and (iii) in the event that such Regulations, revenue rulings, or other pronouncements should ever treat any or all arrangements that facilitate the selling of Company interests and that are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, he will not Transfer any Unit through a matching service that is not approved in advance by the Company. The Company shall, from time to time and at the request of a Unit Holder, consider whether to approve a matching service and shall notify all Unit Holders of any matching service that is so approved. Each Unit Holder further agrees that he will not Transfer any Unit to any Person unless such Person agrees to be bound by this Section 5.7(a) and to Transfer such Units only to Persons who agree to be similarly bound.

     **SECTION 5.8. <u>Distributions and Allocations With Respect to Transferred Units.</u>** If any Unit is sold, assigned, or Transferred during any Allocation Year in compliance with the provisions of this Article V, Profits, Losses, each item thereof, and all other items attributable to such Unit for such Allocation Year shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during such Allocation Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager in its sole discretion. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it receives notice of such Transfer, provided that, if the Company receives notice of a Transfer at least ten (10) business days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer, and provided further that, if the Company does not receive a notice stating the date on which such Unit was transferred and such other information as the Manager may reasonably require within thirty (30) days after the end of the Allocation Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the Unit on the last day of the Allocation Year during which the Transfer occurs. Neither the Company nor the Manager shall incur any liability for making

13

allocations and distributions in accordance with the provisions of this Section 5.8, whether or not the Manager or the Company has actual knowledge of any Transfer of ownership of any Unit.

SECTION 5.9. Drag Along Rights. In the event of a possible Transfer by any Member that would result in one (1) Person (who or which is not currently a Member) owning directly or indirectly Profit Sharing Units representing fifty percent (50%) or more of the issued and outstanding Profit Sharing Units of the Company, the prospective Transferring Member may require the other Member to participate in such sale transaction by Transferring the other Member's Profit Sharing Units in consideration for an amount equal to the price per Profit Sharing Unit at which the Profit Sharing Units of the prospective Transferring Member would be Transferred.

## ARTICLE VI.  MANAGEMENT OF THE COMPANY

SECTION 6.1. Management. In accordance with Sections 605.0407(1)(a)(2) and 605.0201(3)(a) of the Revised Act and with the Articles of Organization, the Company is to be managed by a single manager and is, therefore, a manager-managed company. Except for the rights and powers that the manager has delegated in Section 6.3 below, only the manager shall have any rights or powers to manage and control the business and affairs of the Company.

SECTION 6.2. Initial and Successor Managers. The initial manager shall be DACACO, 265 Clyde Morris Blvd. #100, Ormond Beach, Florida 32174 (the "Manager"). Effective as of the first day of the Fiscal Year following the Base Year (as defined in Section 8.1(b)(i)), the Manager shall be Exfreight Zeta, 2290 10th Avenue, Suite 501, Lake Worth, Florida 33461. If neither DACACO nor Exfreight Zeta is able to serve as the Manager for any reason, a replacement manager shall be appointed by the unanimous consent of the Members. Notwithstanding any other provision of this Agreement to the contrary, no person or entity may be the Manager unless he, she or it also is a member of the Company.

SECTION 6.3. Officers. As permitted by, and in accordance with, Sections 605.0109(8), 605.0201(3)(e), and 605.04071 of the Revised Act, the Manager hereby delegates to the following officers all rights and powers to manage and control the business and affairs of the Company. Each of the following persons is appointed to the office that is set forth opposite his name, to serve in accordance with (i) the Articles of Organization, as they may be amended or restated from time to time, and (ii) this Operating Agreement of the Company, as it may be amended or restated from time to time, until his successor is appointed by the Manager:

| NAME | OFFICE |
|------|--------|
| William G. Davies | President and Chief Executive Officer ("CEO") |
| Charles Marrale | Chief Operating Officer ("COO") |
| Steven T. Huntley | Vice President |

## SECTION 6.4. Employment of Key Employees.

(a) **Charles Marrale.** As a condition precedent, and as an ongoing and continuing condition, of Exfreight Zeta's status as a Member and/or as a Unit Holder, Charles Marrale is required to be a full-time employee of the Company, to serve as the Chief Operating Officer of the Company as described in Sections 6.3 and 6.5(b). Either a resignation from his employment by Chares Marrale or a termination of such employment with cause by DACACO shall constitute a Breach of this Agreement by Exfreight Zeta, and a termination of such employment without cause by DACACO shall constitute a Breach of this Agreement by DACACO. As used in the preceding sentence, "cause" shall mean (1) the imposition of any restrictions or limitations by any governmental authority having jurisdiction over Charles Marrale to such an extent that he is unable to serve as the Company's COO; (2) Charles Marrale's failure or refusal to perform the duties required under this Agreement, or to comply with the policies, standards, and regulations of the Company that may be established from time to time and of which he has written notice; (3) the conviction of Charles Marrale of any criminal offense other than a minor traffic violation; or (4) any conduct that may substantially harm the reputation or operations of the Company or that is materially detrimental to the interests of the Company; or (5) the misappropriation of any funds or Property of the Company by Charles Marrale.

(b) **Steven T. Huntley.** As a condition precedent, and as an ongoing and continuing condition, of the Company as a Member and/or as a Unit Holder, Huntley is required to be a full-time employee of the Company, to serve as Vice President of the Company as described in Sections 6.3 and 6.5(c). Either a resignation from his employment by Huntley or a termination of such employment with or without cause shall constitute a Breach of this Agreement by Huntley. As used in the preceding sentence, "cause" shall mean (1) the imposition of any restrictions or limitations by any governmental authority having jurisdiction over Huntley to such an extent that he is unable to serve as the Company's Vice President; (2) Huntley's failure or refusal to perform the duties required under this Agreement, or to comply with the policies, standards, and regulations of the Company that may be established from time to time and of which he has written notice; (3)

the conviction of Huntley of any criminal offense other than a minor traffic violation; or (4) any conduct that may substantially harm the reputation or operations of the Company or that is materially detrimental to the interests of the Company; or (5) the misappropriation of any funds or Property of the Company by Huntley.

SECTION 6.5. Agency Authority.

(a)    The President shall be the chief executive officer of the Company; shall have general and active management of the business and affairs of the Company subject to the direction of the Manager; and shall, when present, preside at all meetings of the Members.

(b)    The COO shall have exclusive responsibility for the day-to-day management of the Company; provided, however, (i) that the COO shall do so only within the constraints of a budget adopted by the unanimous consent of the Members, and (ii) that no Person or entity on behalf of the Company shall encumber any of the Company's property or assets without the unanimous consent of the Members.

(c)    The Vice-President shall perform the duties of the President in the absence of the President or in the event of the President's death, inability or refusal to act, and when so acting shall have all the powers of, and be subject to the restrictions upon, the President. The Vice-President shall perform such other duties as may be prescribed by the President.

(d)    In accordance with Sections 605.0302(1)(c) and 605.0201(3)(d) of the Revised Act and with the Articles of Organization, William G. Davies shall have authority to execute an instrument transferring real property held in the name of the Company; and

(e)    In accordance with Sections 605.0302(1)(c) and 605.0201(3)(d) of the Revised Act and with the Articles of Organization, the officers of the Company shall have authority to enter into other transactions on behalf of, or otherwise act for or bind, the Company.

SECTION 6.6. Duties and Obligations of the Officers.

(a)  The officers shall cause the Company to conduct its business and operations separate and apart from that of any Member or any of its Affiliates, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of any Member or any of its Affiliates, (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member and its Affiliates, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company

16

meetings and acting on behalf of the Company only pursuant to due authorization of the Members, (iii) causing the Company to pay its liabilities from assets of the Company, and (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(b)   The officers shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Company Property and the use thereof for the exclusive benefit of the Company.

(c)   The officers, or the appropriate one of them, shall take all actions that may be necessary or appropriate (i) for the continuation of the Company's valid existence as a Company under the laws of the State of Florida and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Company Property in accordance with the provisions of this Agreement and applicable laws and regulations.

(d)   The officers, or the appropriate one of them, shall cause to be provided, or cause the Company to carry, such insurance as is customary in the business in which the Company is engaged and in the places in which it is so engaged.

SECTION 6.7.  Nonliability of the Manager and the Officers for Acts or Omissions in their Official Capacity.  To the full extent permitted by 605.0304 and 605.0201(3)(e) of the Revised Act, the Manager and each officer is released from liability for damages and other monetary relief on account of any act, omission, or conduct in its or his managerial capacity.  No amendment or repeal of this section shall affect any liability or alleged liability for any acts, omissions, or conduct that occurred prior to such amendment or repeal.

SECTION 6.8.  Compensation and Expenses.

(a)   No Member, as such, shall receive any salary, fee, or draw for services rendered to, or on behalf of, the Company, nor shall any Member, as such, be reimbursed for any expenses incurred by such Member on behalf of the Company.

(b)   The Manager shall not receive any fees or other compensation for serving as Manager.

17

(c) Only the COO shall receive any compensation from the Company. The amount, form, measurement, and timing of such compensation shall be in accordance with the budget that is required by Section 6.5(b).

(d) The Company shall reimburse the Manager and each officer for any direct expenses reasonably incurred by the Manager or the officer in connection with Company business.

**SECTION 6.9. Operating Restrictions.**

(a) No loans or guarantees of loans shall be made by the Company to any Member, the Manager, any Affiliate of a Manager, or any officer of the Company.

(b) No rebates, kickbacks, or reciprocal arrangements may be received or entered into by the Manager or by any officer, nor may the Manager or any officer participate in any business arrangement that would circumvent this Agreement.

(c) All property in the form of cash not otherwise invested shall either be (i) deposited for the benefit of the Company in one or more accounts of the Company or any of its Affiliates, such accounts to be maintained in such financial institutions as the Manager shall determine, (ii) invested in short-term liquid securities or other cash-equivalent assets, or (iii) left in escrow, and withdrawals shall be made only in the regular course of Company business on such signature or signatures as the Manager may determine from time to time.

**ARTICLE VII. ROLE OF MEMBERS**

**SECTION 7.1. Rights or Powers.** The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.

**SECTION 7.2. Voting Rights.** Notwithstanding Section 7.1 above, the Members shall have the right to vote on such matters, if any, as are specifically reserved for, or made subject to, their approval or consent elsewhere in this Agreement.

**SECTION 7.3. Procedure for Consent.** In any circumstances requiring the approval or consent of the Members as specified in this Agreement, such approval or consent shall, except as expressly provided to the contrary in this Agreement, be given or withheld in the sole and absolute discretion of the Members and conveyed in writing to the Manager not later than thirty (30) days after such approval or consent was requested by the Manager. The Manager may require a response within a shorter time but in no event less than ten (10) business days. Failure to respond within any such time period shall be deemed to constitute a vote that is consistent with the Manager's

recommendation with respect to the proposal. If the Manager receive(s) the necessary approval or consent of the Members to such action, the Manager shall be authorized and empowered to implement such action without any further authorization by the Members.

## ARTICLE VIII. PROFIT SHARING UNITS

### SECTION 8.1. Profit Sharing Units.

(a) The (i) name of, (ii) address of, and (iii) number of Profit Sharing Units held by the Members are as follows:

| Name | Address | Number of Profit Sharing Units |
|------|---------|-------------------------------|
| DACACO Holdings, LLC, a Florida limited liability company | 265 Clyde Morris Blvd. #100 Ormond Beach, Florida 32174 | 48.5 |
| Exfreight Zeta, Inc., an Ontario Canada corporation qualified to transact business in Florida | 2290 10th Avenue, Suite 50 Lake Worth, Florida 33461 | 46.5 |
| Steven T. Huntley | 3301 N. University Drive Suite 425 Coral Springs, Florida 33065 | 5.0 |

Except to the extent permitted by Article V above, the Members shall be the only equity stake holders of the Company.

(b) The number of Profit Sharing Units held by the Members, as set forth in Section 8.1(a) above, shall change from time to time, if ever, as follows:

(i) On, and effective as of, the first day of the Fiscal Year that follows the Fiscal Year during which the Company paid in full the loan described in Section 3.2(g) (including all principal, all interest, and any other amounts that are due and owing thereunder) (hereinafter the "Base Year"), the number of Profit Sharing Units owned by DACACO shall be 47.5, and the number of Profit Sharing Units owned by Exfreight Zeta shall be 47.5.

(ii) Effective as of the first day of the Fiscal Year that follows the Fiscal Year for which the gross revenue of the Company exceeded 130% of the gross revenue of the Company for the Base Year, and thereafter (except as provided in the paragraphs below) the

19

number of Profit Sharing Units owned by DACACO shall be 46.5, and the number of Profit Sharing Units owned by Exfreight Zeta shall be 48.5.

(iii)    Effective as of the first day of the Fiscal Year that follows the Fiscal Year for which the gross revenue of the Company exceeded 150% of the gross revenue of the Company for the Base Year, and thereafter (except as provided in the paragraphs below) the number of Profit Sharing Units owned by DACACO shall be 45.5, and the number of Profit Sharing Units owned by Exfreight Zeta shall be 49.5.

(iv)    Effective as of the first day of the Fiscal Year that follows the Fiscal Year for which the gross revenue of the Company exceeded 170% of the gross revenue of the Company for the Base Year, and thereafter (except as provided in the paragraphs below) the number of Profit Sharing Units owned by DACACO shall be 44.5, and the number of Profit Sharing Units owned by Exfreight Zeta shall be 50.5.

(v)    Effective as of the first day of the Fiscal Year that follows the Fiscal Year for which the gross revenue of the Company exceeded 200% of the gross revenue of the Company for the Base Year, and thereafter, the number of Profit Sharing Units owned by DACACO shall be 43.5, and the number of Profit Sharing Units owned by Exfreight Zeta shall be 51.5.

(vi)    DACACO's percentage stake in, and governance and management control of the Company shall be reduced to as low as forty-two and one half percent (42.5%), and Exfreight Zeta's percentage stake shall be increased to as much as fifty-two and one half percent (52.5%) as and the Company reaches the above milestones. Huntley's equity stake always shall be five percent (5%).

(vii)    Whenever the number of Profit Sharing Units held by each Member changes as provided in this Section 8.1(b), that number shall not change again unless and until the gross revenue of the Company exceeds the next threshold set forth in the applicable paragraph of this Section 8.1(b).

**SECTION 8.2. Other Matters.**

(a)    Except as otherwise provided in this Agreement, no Unit Holder shall demand or receive a return of its Units or withdraw from the Company without the consent of a

Majority in Interest of the Unit Holders. No Unit Holder shall have the right to receive property other than cash, except as may be specifically provided herein.

(b)    Except as otherwise provided in this Agreement, no Unit Holder shall receive any interest, salary, or drawing (i) with respect to its Units or its Capital Account, or (ii) for services rendered to, on behalf of, the Company in its capacity as a Unit Holder.

(c)    Provided that the Members act in accordance with this Agreement, no Member shall be liable for the debts, liabilities, contracts, or any other obligations of the Company.

## ARTICLE IX. ALLOCATIONS

**SECTION 9.1. Profits.** Contrary to Section 605.0404(5) of the Revised Act, profits for any Allocation Year shall be allocated, in their entirety, *pro rata* among the Profit Sharing Unit Holders.

**SECTION 9.2. Losses.** Contrary to Section 605.0404(5) of the Revised Act, losses for any Allocation Year shall be allocated, in their entirety, *pro rata* among the Profit Sharing Unit Holders.

**SECTION 9.3. Special Allocations.** Contrary to Section 605.0404(5) of the Revised Act, the following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Article IX, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Unit Holder shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Person's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Unit Holder pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 9.3(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article IX, if there

is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Manager and Unit Holder pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 9.3(b) is intended to comply with the minimum gain chargeback requirement in Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event any Unit Holder who is not a Manager unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Unit Holder in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Unit Holder as quickly as possible, provided that an allocation pursuant to this Section 9.3(c) shall be made if and only to the extent that such Unit Holder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.3(c) were not in the Agreement.

(d) Gross Income Allocation. In the event any Unit Holder who is not a Manager has a deficit Capital Account at the end of any Allocation Year that is in excess of the sum of (i) the amount such Unit Holder is obligated to restore (pursuant to the terms of such Unit Holder's Promissory Note or otherwise) and (ii) the amount such Unit Holder is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Unit Holder shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 9.3(d) shall be made if and only to the extent that such Unit Holder would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IX

22

have been tentatively made as if Section 9.3(c) hereof and this Section 9.3(d) were not in the Agreement.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Unit Holders.

(f) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Manager or Unit Holder who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(g) Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)(2) or Section 1.704-1(b)(2)(iv)(*m*)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Unit Holder in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Manager and Unit Holders in accordance with their interests in the Company in the event that Regulations Section 1.704-1(b)(2)(iv)(*m*)(2) applies, or to the Manager and Unit Holders to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(*m*)(4) applies.

(h) Imputed Interest. To the extent the Company has taxable interest income with respect to any Promissory Note pursuant to Code Section 483 or Sections 1271 through 1288;

(i) Such interest income shall be specially allocated to the Unit Holder to whom such Promissory Note relates; and

(ii) The amount of such interest income shall be excluded from the Capital Contributions credited to such Unit Holder's Capital Account in connection with payments of principal with respect to such Promissory Note.

(i) Basis Increases. In the event the adjusted tax basis of any Code Section 38 property that has been placed in service by the Company is increased pursuant to Code Section 50(c), such increase shall be specially allocated among the Manager and Unit Holders (as an item in the nature of income or gain) in the same proportions as the investment tax credit that is recaptured with respect to such property is shared among the Manager and Unit Holders.

23

(j) Basis Reductions. Any reduction in the adjusted tax basis (or cost) of Partnership Code Section 38 property pursuant to Code Section 50(c) shall be specially allocated among the Manager and Unit Holders (as an item in the nature of expenses or losses) in the same proportions as the basis (or cost) of such property is allocated pursuant to Regulations Section 1.46-3(f)(2)(i).

(k) Allocations Relating to Taxable Issuance of Company Interests. Any income, gain, loss, or deduction realized as a direct or indirect result of the issuance of an interest in the Company by the Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

SECTION 9.4. Curative Allocations. The allocations set forth in Sections 9.2(b), 9.3(a), 9.3(b), 9.3(c), 9.3(d), 9.3(e), 9.3(f), and 9.3(g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.4. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it/they determine(s) appropriate so that, after such offsetting allocations are made, the Manager's and Unit Holder's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Manager or Unit Holder would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 9.1, 9.2(a), 9.3(h), 9.3(i), 9.3(j), 9.3(k), 9.3(l), and 9.5. In exercising its discretion under this Section 9.4, the Manager shall take into account future Regulatory Allocations under Sections 9.3(a) and 9.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.3(e) and 9.3(f).

ARTICLE X.  DISTRIBUTIONS

SECTION 10.1.  Cash Distributions.  Contrary to Section 605.0404(1) of the Revised Act, and except as otherwise provided in Article XI hereof, the Company shall make cash distributions, at such times and in such aggregate amounts as the Manager shall determine in its sole and absolute discretion, *pro rata* among the Profit Sharing Unit Holders.  Notwithstanding the preceding sentence to the contrary, cash distributions by the Company to the Profit Sharing

Unit Holders shall never be less frequent than annually, and at or before the delivery of tax information required by Section 12.3 of this Agreement, and the aggregate (i.e. for all Profit Sharing Unit Holders) annual amount of which shall never be less than _____% [Garrett to provide this number] of the amount of the total taxable income of the Company for the Company's preceding Fiscal Year (as shown on its federal income tax return).

SECTION 10.2.   Amounts Withheld.  All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local, or foreign tax law with respect to any payment, distribution, or allocation to the Company, the Manager, or the Unit Holders, and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Unit Holder or any Person owning an interest, directly or indirectly, in such Unit Holder, shall be treated as amounts distributed to the Unit Holder with respect to which such amount was withheld pursuant to this Section 10.3 for all purposes under this Agreement. The Manager is authorized to withhold from distributions, or with respect to allocations, to the Unit Holders and to pay over to any federal, state, local, or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local, or foreign law and shall allocate any such amounts to the Unit Holders with respect to whom or to which such amount was withheld.

ARTICLE XI: DISSOLUTION AND WINDING UP

SECTION 11.1.   Liquidating Events.  The Company shall dissolve, and commence winding up and liquidating, upon the occurrence of either of the following ("Liquidating Events"):

(a)     The sale of all or substantially all of the Company Property, whenever, however, and on whatever terms the Members may unanimously determine, each in its sole and absolute discretion; or

(b)     The happening of any event that makes it unlawful, impossible, or impractical to carry on the business of the Company.

The Members hereby agree that, notwithstanding any provision of the Revised Act, the Company shall not dissolve prior to the occurrence of a Liquidating Event.

SECTION 11.2.   Winding Up.  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors, Members, and Unit Holders, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the

winding up of the Company's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Property has been distributed pursuant to this Section 11.2 and the Articles of Organization have been cancelled in accordance with the Revised Act. The Manager shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and Company Property, shall cause the Company Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

        (a)     First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than the Members or their Affiliates;

        (b)     Second, to the payment and discharge of all the Company's debts and liabilities to the Members or their Affiliates; and

        (c)     The balance, if any, to the Members or their Affiliates and Unit Holders in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all Allocation Periods.

Each Member understands and agrees that, by accepting the provisions of this Section 11.2 setting forth the priority of the application of the assets of the Company to be made upon its liquidation, such Member expressly waives any right that he, as a creditor of the Company, might otherwise have under the LLC Act to receive assets *pari passu* with the other creditors of the Company in connection with satisfaction of any liability of the Company, and hereby subordinates to said creditors any such right.

**SECTION 11.3.  Compliance With Certain Requirements of Regulations; Deficit Capital Accounts.**  In the event that the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*g*) (other than pursuant to Code Section 708(b)(1)(B)), distributions shall be made pursuant to this Article XI to the Unit Holders who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(*b*)(2). If any Unit Holder has a deficit balance in its Capital Account (after giving effect to all contributions, distributions, and allocations for all Allocation Years, including the Allocation Year during which such liquidation occurs), such Unit Holder shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a

debt owed to the Company or any other Person for any purpose whatsoever. In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Manager and Unit Holders pursuant to this Article XI may be:

(a)    distributed to a trust established for the benefit of the Unit Holders for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Manager arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Unit Holders from time to time, in the reasonable discretion of the Manager, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Unit Holders pursuant to Section 11.2 hereof; or

(b)    withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Unit Holders as soon as practicable.

In addition to the above, any Member whose interest in the Company is liquidated (other than in connection with the liquidation of the Company) shall be distributed an amount equal to the positive balance in its Capital Account in compliance with Regulations Section 1.704-1(b)(2)(ii)(*b*)(2) and if such Member's Capital Account has a deficit balance (after giving effect to all contributions, distributions, and allocations for all Allocation Years, including the Allocation Year during which such Member's interest is liquidated), (i) if such Member is the Manager, such Member shall contribute to the capital of the Company the amount necessary to restore such deficit balance to zero in compliance with Regulations Section 1.704-1(b)(2)(ii)(*b*)(3) and (ii) if such Member is a Unit Holder, such Member shall have no obligation to contribute to the capital of the Company the amount necessary to restore such deficit balance to zero in compliance with Regulations Section 1.704-1(b)(2)(ii)(*b*)(3).

**SECTION 11.4. Deemed Contribution and Distribution.** In the event the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*g*) but no Liquidating Event has occurred, the Company Property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have contributed all Company Property and liabilities to a new limited partnership in exchange for an interest in such new limited

partnership and, immediately thereafter, the Company will be deemed to liquidate by distributing interests in the new limited partnership to the Members.

SECTION 11.5. **Rights of Members and Unit Holders.** Except as otherwise provided in this Agreement, (i) the Members and Unit Holders shall look solely to the assets of the Company for the return of its Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company and (ii) no Unit Holder shall have priority over any other Unit Holder as to the return of its Capital Contributions, distributions, or allocations.

SECTION 11.6. **Notice of Dissolution.** In the event a Liquidating Event occurs or an event occurs that would, but for the provisions of Section 11.1, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, (i) provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager) and (ii) publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Manager).

## ARTICLE XII. BOOKS AND RECORDS

SECTION 12.1. **Books and Records.** The Manager shall maintain at its principal place of business separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business, all in accordance with this Agreement. The Company shall use the accrual method of accounting in preparation of its annual reports and for tax purposes and shall keep its books and records accordingly. Any Member or its designated representative shall have the right, at any reasonable time, to have access to, to inspect, and to copy the contents of such books or records. The Manager shall provide to the Members monthly financial statements of the Company.

SECTION 12.2. **Annual Reports.** Within one hundred eighty (180) days after the end of each Company Fiscal Year, the Manager shall cause to be prepared, and shall make available to each Member, compiled financial statements accompanied by the appropriate report thereon from the Company's accountants, stating that such statements are prepared in accordance with this Agreement, including the following:

      (a)      The balance sheet of the Company as of the last day of such Fiscal Year;

      (b)      A statement of income or loss for the Company for such Fiscal Year;

     (c)    A statement of the Members' Capital Accounts and changes therein for such Fiscal Year; and

     (d)    A statement of Company cash flow for such Fiscal Year.

    **SECTION 12.3.** Tax Information. Necessary tax information shall be delivered to each Member within one hundred eighty (180) days after the end of each Company Fiscal Year.

**ARTICLE XIII. AMENDMENTS**

    **SECTION 13.1.** Amendments.

     (a) The Manager, or Members holding ten percent (10%) or more of the Units, may propose amendments to this Agreement. Following such proposal, the Manager shall submit to the Members a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Manager shall include in any such submission a recommendation as to the proposed amendment. The Manager shall seek the written vote of the Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of a majority of the Members.

     (b) Notwithstanding Section 13.1(a) hereof,

     (i) This Agreement shall not be amended without the consent of each Member who would be adversely affected if such amendment (A) modified the limited liability of a Member, or (B) altered the interest of a Member in Profits, Losses, Capital Gains or other items thereof, or in any Company distributions; and

     (ii) This Agreement may be amended by the Manager, without the consent of any of the Members to: (A) add to the representations, duties, or obligations of the Manager, or surrender any right or power granted to the Manager herein, for the benefit of the Members; (B) cure any ambiguity, to correct or supplement any provision hereof that may be inconsistent with any other provisions hereof, or to make any other provision with respect to matters or questions arising under this Agreement not inconsistent with the intent of this Agreement; and (C) change any provision of this Agreement required to be so changed by the staff of the Securities and Exchange Commission or other federal agency, or by a state "Blue Sky" commissioner or similar official, which change is deemed by such commissioner, agency, or official to be for the benefit or protection of the Members, provided that no amendment shall be adopted pursuant to this

Section 13.1(b)(ii) unless the adoption thereof is for the benefit of, or not adverse to, the interests of the Members and does not violate Section 13.1(b)(i) hereof.

### ARTICLE XIV.  DEFINITIONS

For purposes of this Agreement, unless the language or context clearly indicates that a different meaning is intended, the words, terms and phrases defined in this section have the following meanings:

(a)    "Adjusted Capital Account Deficit" means, with respect to any Unit Holder, the deficit balance, if any, in such Unit Holder's Capital Account as of the end of the relevant fiscal Allocation Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts that such Unit Holder is obligated to restore (pursuant to the terms of such Unit Holder's Promissory Note, any provision of this Agreement, or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)($d$)($4$), 1.704-1(b)(2)(ii)($d$)($5$), and 1.704-1(b)(2)(ii)($d$)($6$).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)($d$) and shall be interpreted consistently therewith.

(b)    "Affiliate" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any officer, director, or manager of such Person, or (iv) any Person who is an officer, director, manager, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, whether direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract, or otherwise.

(c)    "Agreement" means this Operating Agreement, as amended from time to time pursuant to Section 13.1 hereof.

30

(d)   "Allocation Year" means (i) the period commencing on the Effective Date and ending on December 31, 2015, (ii) any subsequent period commencing on January 1 and ending on the following December 31, or (iii) any portion of the period described in clause (ii) for which the Company is required to allocate Profits, Losses, Capital Gains and other items of Company income, gain, loss, or deduction pursuant to Article IX.

(e)   "Capital Account" means, with respect to any Member or Unit Holder, the Capital Account maintained for such Person in accordance with the following provisions:

(i)   To each Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 3.3 or Section 3.4, and the amount of any Company liabilities assumed by such Person or that are secured by any Company Property distributed to such Person.

(ii)   To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company Property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section 3.3 or Section 3.4, and the amount of any liabilities of such Person assumed by the Company or that are secured by any property contributed by such Person to the Company.

(iii) In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv) In determining the amount of any liability for purposes of subparagraphs (i) and (ii), there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company, the Manager, or the Unit Holders), are computed in order to comply with such Regulations, the

31

Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member or Unit Holder pursuant to Article XI hereof upon the dissolution of the Company. The Manager also (i) shall make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Members and Unit Holders and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(*q*) and (ii) shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

(f)     "Capital Gains" means any gain that is realized by the Company in a transaction that is not in the ordinary course of its business.

(g)     "Capital Gain Unit" means that element of a membership interest in the Company (the other elements being a Capital Interest in the Company or Profits Sharing Units) that is a percentage share of the Capital Gains of the Company, and of every component thereof. The amount of such percentage share that is represented by one (1) Capital Gains Unit as of any given time is determined by dividing one (1) by the total number of Capital Gains Units that are issued and outstanding as of that time.

(h)     "Capital Interest" means the right of any Member to be paid the amount in that Member's Capital Account.

(i)     "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(j)     "Company" means Exfreight of Florida, LLC, a Florida limited liability company.

(k)     "Company Property" means all real and personal property acquired and operated by the Company and any improvements thereto as set forth in the Memorandum, and shall include both tangible and intangible property.

(l)     "Compete" or "to Compete" with the Company means to engage – anywhere in the world – in the same or any similar business as the Company's business, in any manner whatsoever, including competing as a proprietor, partner, investor, shareholder, director, officer, employee, consultant, independent contractor, or otherwise.

(m)     "Debt" means (i) any indebtedness for borrowed money or deferred purchase price of property or evidenced by a note, bonds, or other instruments, (ii) obligations as

lessee under capital leases, (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien, or charge of any kind existing on any asset owned or held by the Company, whether or not the Company has assumed or become liable for the obligations secured thereby, (iv) any obligation under any interest rate swap agreement (the principal amount of such obligation shall be deemed to be the notional principal amount on which such swap is based), and (v) obligations under direct or indirect guarantees of (including obligations (contingent or otherwise) to assure a creditor against loss in respect of) indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii), and (iv) above, provided that Debt shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

(n)   "Default Rule" means a rule stated in the LLC Act:

(i) which structures, defines, or regulates the finances, governance, operations, or other aspects of a limited liability company organized pursuant to the LLC Act, and

(ii) which applies except to the extent that the LLC Act allows it to be negated or modified through the provisions of a limited liability company's articles of organization or operating agreement.

(o)   "Depreciation" means, for each Allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation amortization or other cost recovery deduction allowable for such Allocation Year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

(p)   "Effective Date" has the meaning ascribed to it on page 1 of this Agreement.

(q)   "Fiscal Year" means (i) the period commencing on the Effective Date and ending on December 31, 2016 and (ii) any subsequent period commencing on January 1 and ending on the earlier to occur of (A) the following December 31, or (B) the date on which all Company

Property is distributed pursuant to Article XI and the Articles of Organization have been canceled pursuant to the LLC Act.

(r)    "Liquidating Event" has the meaning set forth in Section 10.1 hereof.

(s)    "Majority in Interest" means, at any given time, any group of Members who hold, collectively, more than fifty percent (50%) of the then issued and outstanding Profit Sharing Units and more than fifty percent (50%) of the then issued and outstanding Capital Gains Units.

(t)    "Manager" means a person duly elected under Article VIII to manage the business of the Company, as well as any person who serves in an interim capacity under that Article.

(u)    "Member" means a person who owns at least one Unit as reflected in the Required Records, and who has been admitted as a Member.

(v)    "Member Nonrecourse Debt" has the meaning set forth in Regulations Section 1.704-2(b)(4).

(w)    "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

(x)    "Member Nonrecourse Deductions" has the meaning set forth in Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

(y)    "Nonrecourse Deductions" has the meaning set forth in Regulations Section 1.704-2(b)(1).

(z)    "Nonrecourse Liability" has the meaning set forth in Regulations Section 1.704-2(b)(3).

(aa)   "Official Capacity" means (i) with respect to a Manager, the position of Manager in the Company, (ii) with respect to a person other than a Manager, the elective or appointive office or position held by an officer, member of a committee of the Management Committee, if any, or the efforts undertaken by a Member of the Company who acts on behalf of and at the request of the Company, or the employment or agency relationship undertaken by an employee or agent of the Company, and (iii) with respect to a manager, member, officer, employee, or agent of the Company who, while a manager, officer, employee, or agent of the Company, is or

was serving at the request of the Company or whose duties in that position involve or involved service as a manager, officer, Member, trustee, or agent of another organization or employee benefit plan, the position of that person as a manager, officer, Member, trustee, employee, or agent, as the case may be, of the other organization or employee benefit plan.

(bb) "Permitted Transfer" has the meaning set forth in Section 10.2 hereof.

(cc) "Person" means any individual, partnership (whether general or limited and whether domestic or foreign), limited liability company, corporation, trust, estate, association, custodian, nominee, or other entity.

(dd) "Profits" and "Losses" means, for each Allocation Year, an amount equal to the Company's taxable income or loss attributable to the operation of the Company's business in the ordinary course — and not attributable to any Capital Gains or capital losses realized by the Company — for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

i. Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

ii. Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

iii. In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

iv. Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

35

v.    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year or other period, computed in accordance with the definition of "Depreciation";

vi.    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)($m$)($4$) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Manager's or Unit Holder's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

vii.    Notwithstanding any other provision of this definition of "Profits" and "Losses," any items that are specially allocated pursuant to Section 3.3 or Section 3.4 hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.3 and 3.4 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

(hh)    "Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(ii)    "Regulatory Allocations" has the meaning set forth in Section 3.4 hereof.

(jj)    "Required Records" means those records that Section 608.4101, Florida Statutes, requires the Company to maintain.

(kk)    "Revised Act" means the Florida Revised Limited Liability Company Act, Chapter 605, Florida Statutes (2014), as it may be amended from time to time.

(ll)    "Transfer" means, as a noun, any voluntary or involuntary transfer, sale, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, or otherwise dispose of.

(mm)    "Unit Holder" or "Unit Holders" means all entities who hold Profit Sharing Units, regardless of whether it has been admitted to the Company as a Member.

(nn)    "Units", when no distinction is made, means any and all Profit Sharing Units and any and all Capital Gain Units.

(oo)    "Wholly Owned Affiliate" of any Person means an Affiliate of such Person (i) one hundred percent (100%) of the voting stock or beneficial ownership of which is owned directly by such Person, or by any Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, (ii) an Affiliate of such Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, and (iii) any Wholly Owned Affiliate of any Affiliate described in clause (i) or clause (ii).

## ARTICLE XV: MISCELLANEOUS

**SECTION 15.1: Notices.** Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and sent by overnight courier, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a hard copy of the telephone conversation or facsimiled communication sent by overnight courier, charges prepaid and addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members:

(a)    If to the Company, at the address set forth in Section 1.1 hereof;

(b)    If to the Manager, to the addresses set forth in Section 6.1(a) hereof; and

(c)    If to a Member or to all of the Members, to the addresses set forth in Section 8.1(a).

Any such notice shall be deemed to be delivered, given, and received for all purposes as of the date so delivered.

**SECTION 15.2: Binding Effect.** Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon, and inure to the benefit of, the Members and their respective heirs, legatees, legal representatives, successors, transferees, and assigns.

**SECTION 15.3: Construction.** Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member. The terms of this Agreement are intended to embody the economic relationship among the Members and shall not be subject to modification by, or be conformed with, any actions by the

Internal Revenue Service except as this Agreement may be explicitly so amended and except as may relate specifically to the filing of tax returns.

SECTION 15.4:  **Headings.**  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

SECTION 15.5:  **Severability.**  Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

SECTION 15.6:  **Incorporation by Reference.**  Every exhibit, schedule and other appendix attached to this Agreement and referred to herein is not incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

SECTION 14.7:  **Further Action.**  Each Member, upon the request of the Manager, agrees to perform all further acts and execute, acknowledge, and deliver any documents that may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

SECTION 15.8:  **Variation of Pronouns.**  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

SECTION 15.9:  **Governing Law.**  The laws of the State of Florida shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

SECTION 15.10:  **Waiver of Action for Partition; No Bill for Company Accounting.**  Each of the Members irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Company Property. To the fullest extent permitted by law, each Member covenants that it will not (except with the consent of the Manager) file a bill for Company accounting.

SECTION 15.11:  **Counterpart Execution.**  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

SECTION 15.12:  **Sole and Absolute Discretion.**  Except as otherwise provided in this Agreement, all actions that the Manager may take and all determinations that the Manager may

38

make pursuant to this Agreement may be taken and made at the sole and absolute discretion of such Manager.

SECTION 15.13:  **Specific Performance.**  Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the day first above set forth.

MEMBERS:

DACACO HOLDINGS, LLC,
a Florida limited liability company

By: _____
      William G. Davies, Manager

EXFREIGHT ZETA, INC.
An Ontario Canada corporation
qualified to transact business in Florida

By: _____
      Charles Marrale, Director

_____
STEVEN T. HUNTLEY

MANAGER:

DACACO HOLDINGS, LLC,
a Florida limited liability company

By: _____
      William G. Davies, Manager


OFFICERS:

_____
William G. Davies
President and Chief Executive Officer

_____
Charles Marrale
Chief Operating Officer

_____
Steven T. Huntley
Vice President

EXHIBIT 2 TO COMPLAINT

 **BankUnited**

Page: 1
Statement Date: January 31, 2016
Account Number: ********045

>005737 6094652 0001 008229 10Z
EXFREIGHT OF FLORIDA LLC
OPERATING ACCOUNT
2290 10TH AVE STE 501
LAKE WORTH FL 33461

### Customer Service Information

| | |
|---|---|
| Client Care Center: | 877-779-BANK (2265) |
| Web Site: | www.bankunited.com |
| Mailing Address: | BankUnited |
| | P.O. Box 521599 |
| | Miami, FL 33152-1599 |

### Special Information

Please refer to the Statement Messages section at
the end of this statement to read about our annual
Privacy Notice.

## COMMERCIAL ANALYSIS CHECKING Account ********045

### Account Summary

| | | | | |
|---|---|---|---|---|
| Statement Balance as of 01/14/2016 | | | | $0.00 |
| Plus | 2 | Deposits and Other Credits | | $939,517.72 |
| Less | 2 | Withdrawals, Checks, and Other Debits | | $705,796.85 |
| Less | | Service Charge | | $0.00 |
| Plus | | Interest Paid | | $0.00 |
| Statement Balance as of 01/31/2016 | | | | $233,720.87 |

### Activity By Date

| Date | Description | Withdrawals | Deposits | Balance |
|---|---|---|---|---|
| 01/26/2016 | INCOMING DOM WIRE: IPS WORLDWI | | $905,796.85 | $905,796.85 |
| 01/26/2016 | OUTGOING DOM WIRE: EXFREIGHT Z | $689,462.09 | | $216,334.76 |
| 01/27/2016 | OUTGOING DOM WIRE: EXFREIGHT Z | $16,334.76 | | $200,000.00 |
| 01/28/2016 | SWEEP FROM DDA | | $33,720.87 | $233,720.87 |

### Balances by Date

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 01/14 | $0.00 | 01/26 | $216,334.76 | 01/27 | $200,000.00 | 01/28 | $233,720.87 |

### Other Balances

| | |
|---|---|
| Minimum Balance this Statement Period | $0.00 |

## Statement Messages

Privacy Notice – Federal law requires us to tell you how we collect, share, and protect your personal information. Our privacy policy has not changed and you may review our policy and practices with respect to your personal information at www.bankunited.com/privacy-notice or we will mail you a free copy upon request if you call us at 1-877-779-BANK (2265).

NOTE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION

**BankUnited, N.A.**

 **BankUnited**

Page: 1
Statement Date: February 29, 2016
Account Number: ********045

>020016 6183049 0002 008229 107
EXFREIGHT OF FLORIDA LLC
OPERATING ACCOUNT
2290 10TH AVE STE 501
LAKE WORTH FL 33461

### ⌖ Customer Service Information

| | |
|---|---|
| Client Care Center: | 877-779-BANK (2265) |
| Web Site: | www.bankunited.com |
| Mailing Address: | BankUnited |
| | P.O. Box 521599 |
| | Miami, FL 33152-1599 |

### ⌖ Special Information

Introducing Mobile Deposit! Now you can deposit checks from your mobile device. Visit www.bankunited.com for more information.

---

## COMMERCIAL ANALYSIS CHECKING  Account ********045

### Account Summary

| | | | |
|---|---|---|---|
| Statement Balance as of 01/31/2016 | | | $233,720.87 |
| Plus | 20 | Deposits and Other Credits | $612,051.33 |
| Less | 10 | Withdrawals, Checks, and Other Debits | $783,626.09 |
| Less | | Service Charge | $61.84 |
| Plus | | Interest Paid | $0.00 |
| Statement Balance as of 02/29/2016 | | | $62,084.27 |

### Activity By Date

| Date | Description | Withdrawals | Deposits | Balance |
|---|---|---|---|---|
| 02/01/2016 | SWEEP FROM DDA | | $2,066.81 | $235,787.68 |
| 02/02/2016 | TRANSFER TO DDA | $33,276.47 | | $202,511.21 |
| 02/03/2016 | TRANSFER TO DDA | $200,000.00 | | $2,511.21 |
| 02/04/2016 | SWEEP FROM DDA | | $48,385.79 | $50,897.00 |
| 02/05/2016 | TRANSFER TO DDA | $43,383.91 | | $7,513.09 |
| 02/09/2016 | LOCKBOX DEPOSIT | | $70,496.78 | $78,009.87 |
| 02/09/2016 | SWEEP FROM DDA | | $8,837.69 | $86,847.56 |
| 02/10/2016 | INCOMING DOM WIRE: IPS WORLDWI | | $150,000.00 | $236,847.56 |
| 02/10/2016 | SWEEP FROM DDA | | $343.02 | $237,190.58 |
| 02/11/2016 | SWEEP FROM DDA | | $47,856.25 | $285,046.83 |
| 02/12/2016 | TRANSFER TO DDA | $209,018.91 | | $76,027.92 |
| 02/12/2016 | RPA SERV CHG DEBIT | $61.84 | | $75,966.08 |
| 02/16/2016 | LOCKBOX DEPOSIT | | $22,141.69 | $98,107.77 |
| 02/16/2016 | SWEEP FROM DDA | | $6,518.22 | $104,625.99 |
| 02/17/2016 | SWEEP FROM DDA | | $9,434.24 | $114,060.23 |
| 02/18/2016 | TRANSFER TO DDA | $36,831.51 | | $77,228.72 |
| 02/19/2016 | TRANSFER TO DDA | $70,000.00 | | $7,228.72 |
| 02/22/2016 | LOCKBOX DEPOSIT | | $80,303.13 | $87,531.85 |
| 02/22/2016 | SWEEP FROM DDA | | $6,205.38 | $93,737.23 |
| 02/23/2016 | LOCKBOX DEPOSIT | | $50,009.54 | $143,746.77 |
| 02/23/2016 | SWEEP FROM DDA | | $11,963.15 | $155,709.92 |
| 02/24/2016 | TRANSFER TO DDA | $150,000.00 | | $5,709.92 |
| 02/24/2016 | LOCKBOX DEPOSIT | | $1,672.76 | $7,382.68 |
| 02/25/2016 | LOCKBOX DEPOSIT | | $2,395.93 | $9,778.61 |
| 02/25/2016 | SWEEP FROM DDA | | $38,886.60 | $48,665.21 |
| 02/26/2016 | TRANSFER TO DDA | $39,442.53 | | $9,222.68 |

---

NOTE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION

**BankUnited, N.A.**

 **BankUnited**

Page: 3
Statement Date: February 29, 2016
Account Number: ^^^^^^^^045

## Activity By Date

| Date | Description | Withdrawals | Deposits | Balance |
|------|-------------|-------------|----------|---------|
| 02/26/2016 | LOCKBOX DEPOSIT | | $8,781.44 | $18,004.12 |
| 02/26/2016 | FOREIGN CK#1772 DEP ON 2/25/16 | $719.70 | | $17,284.42 |
| 02/26/2016 | FOREIGN CK#11301 DEP ON 2/25 | $953.06 | | $16,331.36 |
| 02/29/2016 | LOCKBOX DEPOSIT | | $45,487.20 | $61,818.56 |
| 02/29/2016 | SWEEP FROM DDA | | $265.71 | $62,084.27 |



## Balances by Date

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|------|---------|
| 01/31 | $233,720.87 | 02/05 | $7,513.09 | 02/16 | $104,625.99 | 02/23 | $155,709.92 |
| 02/01 | $235,787.68 | 02/09 | $86,847.56 | 02/17 | $114,060.23 | 02/24 | $7,382.68 |
| 02/02 | $202,511.21 | 02/10 | $237,190.58 | 02/18 | $77,228.72 | 02/25 | $48,665.21 |
| 02/03 | $2,511.21 | 02/11 | $285,046.83 | 02/19 | $7,228.72 | 02/26 | $16,331.36 |
| 02/04 | $50,897.00 | 02/12 | $75,966.08 | 02/22 | $93,737.23 | 02/29 | $62,084.27 |

## Other Balances

Minimum Balance this Statement Period                                                    $2,511.21

## Statement Messages

Deposit checks anywhere, anytime! Now you can deposit checks quickly and securely from your mobile device at no additional cost. Download the BankUnited mobile banking app today to get started. To learn more, visit our website at www.bankunited.com.

**BankUnited, N.A.**

# EXHIBIT "B"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:                                          CASE NO. 6:19-bk-00511-KSJ

IPS WORLDWIDE, LLC,                             CHAPTER 11

          Debtor.

_____/

ALEX D. MOGLIA, TRUSTEE,                        Adv. Pro. No. 20-ap

          Plaintiff,

vs.

EXFREIGHT OF FLORIDA, LLC, a Florida
limited liability company, EXFREIGHT
ZETA, LLC, a Florida limited liability
company, DACACO HOLDINGS, LLC, and
Florida limited liability company, and
STEPHEN HUNTLEY, an individual,

          Defendants.

_____/

**CONSENT FINAL JUDGMENT AGAINST EXFREIGHT ZETA, LLC**

**THIS ADVERSARY PROCEEDING** came on for consideration upon the joint motion ("Motion") of **CHAPTER 11 TRUSTEE, ALEX D. MOGLIA** ("Trustee") and **EXFREIGHT ZETA, LLC** ("Zeta"), for entry of a Consent Final Judgment pursuant to the terms set forth in the Settlement, which was approved by this Court on February  , 2020 (Doc. No. ). Upon review of the Motion, and the Court being duly advised in the premises, it is

**ORDERED:**

1.      Final Judgment is entered against the Defendant, Exfreight Zeta, LLC, pursuant to Count VII of the Complaint and the Settlement.

2.      Pursuant to the Settlement, Zeta admits no liability or knowledge with respect to the following: (i) the allegations in Count VII of the Complaint; (ii) the Debtor's fraudulent intent with respect to the EOF Fraudulent Transfers (as defined in the Complaint); and (iii) the receipt of the fraudulent conveyances from the Debtor or other Defendants.

3.      Upon entry of a judgment against DACACO Holdings, LLC ("DACACO") and Steven Huntley ("Huntley") or otherwise getting relief that divests DACACO and Huntley of any ownership in Exfreight of Florida, LLC ("EOF") and/or Zeta, Zeta (or its assigns) will have three (3) months to redeem or take assignment of such ownership in return for paying the bankruptcy estate $1,055,796.85. The Trustee shall provide written notice to Zeta's counsel via US Mail at Michael A. Kaufman, Esq., 1615 Forum Place, Suite 3A, West Palm Beach, Florida 33401, via US Mail to Zeta at Attn: Charles Marrale, 2290 10th Avenue North, #501, Lake Worth, Florida 33461 and email to Zeta's counsel at michael@mkaufmanpa.com, upon entry of a judgment against DACACO and Huntley, or upon other relief which divests DACACO and Huntly of any ownership in EOF and/or Zeta.

4.    If the Trustee is not successful in avoiding or recovering DACACO's interest in EOF and/or Zeta within fifteen (15) months, the obligation of Zeta to pay the $1,055,796.85 will be waived and Zeta will receive a release of any claims by the estate. If the Trustee is successful in avoiding or recovering DACACO's interest in EOF and/or Zeta within fifteen (15) months but Zeta does not pay the $1,055,796.85 within the agreed three (3) months, the estate will be entitled to entry of a final judgment against Zeta in the amount of $1,055,796.85, or, at the option of the Trustee, to invoke its rights as owner of EOF and/or Zeta.

5.    Once payment is made by Zeta or an entity on behalf of Zeta, the Trustee will assign the bankruptcy estate's interest that DACACO and/or Huntley had in Zeta and/or EOF to the Zeta entity which provides the payment due under the Settlement. Furthermore, the Trustee will transfer and assign any and all remaining interests which the bankruptcy estate may have in Zeta and/or EOF to the Zeta entity which provides the payment due under the Settlement. Attached as Exhibits "B" and "C" are forms of the assignment which will be used.

6.    Plaintiff shall take no action to collect the judgment against Defendant Zeta until the conditions set forth in paragraph 4 above are met.

7.    Jurisdiction of this case is retained to enter further Orders as are proper and to enforce the provisions of this Final Judgment including, without limitation, issuance of wits, subpoenas and commencement of proceedings supplementary to execution.

### 

Attorney Shuker is directed to serve a copy of this Order upon all interested parties and file a certificate of service within 3 days after its entry.

# EXHIBIT "C"

## ASSIGNMENT AND ASSUMPTION
## OF INTEREST IN EXFREIGHT ZETA, LLC

KNOW ALL MEN BY THESE PRESENTS that the undersigned, IPS WORLDWIDE, LLC (the "Assignor"), hereby assigns, transfers and conveys to EXFREIGHT ZETA, LLC (the "Assignee"), all of Assignor's rights, title and interest as a member in EXFREIGHT ZETA, LLC (the "Assigned Interest"), consistent with the dates set forth in the parties' settlement agreement.

Assignor further and specifically represents and warrants that it has no further ownership interest in EXFREIGHT ZETA, LLC other than the Assigned Interest, and that Assignor releases all rights it has and does claim to be held as a member, managing member, director, officer, employee or other agent of, in and through all EXFREIGHT ZETA, LLC.

Assignee, who is a member of EXFREIGHT ZETA, LLC, hereby agrees to accept Assignor's interest, if any, and further agrees to assume all obligations under the Articles of Organization and the Operating Agreement, if any, of EXFREIGHT ZETA, LLC as to the membership interest received from Assignor.

The parties agree that this Assignment and Assumption of Interest is hereby assigned, transferred and conveyed from Assignor to Assignee for One Dollar ($1.00) and other good and valuable consideration set forth herein, receipt of which is acknowledged by Assignor by signing below.

Each party hereby acknowledges and agrees that the requisite notice of Assignor's desire to sell or transfer its ownership interest, the requisite written offer by Assignee to buy the Assignor's ownership interest, and the acceptance of that offer by the Assignor, as provided for under Florida and any other applicable laws, has been properly waived or fulfilled with respect to this single transaction.

IN WITNESS WHEREOF, this Assignment and Assumption of Interest has been duly executed by the parties hereto as of the _____ day of _____, 2020

**ASSIGNOR:**                                    **ASSIGNEE:**


_____        _____
ALEX D. MOGLIA,                                 CHARLES MARRALE
as the Chapter 11 Trustee of
IPS WORLDWIDE, LLC


STATE OF FLORIDA

COUNTY OF _____

    This instrument was acknowledged before me this _____ day of _____, 2020, by ALEX D. MOGLIA, as the Chapter 11 Trustee of IPS WORLDWIDE, LLC, Member, who ( ) is personally known to me or who ( ) has produced a driver's license as identification.


                              _____
                              NOTARY PUBLIC
                              Name:
                              Commission No.:
                              Expiration Date:


STATE OF FLORIDA

COUNTY OF _____

    This instrument was acknowledged before me this _____ day of _____, 2020, by CHARLES MARRALE, who ( ) is personally known to me or who ( ) has produced a driver's license as identification.


                              _____
                              NOTARY PUBLIC
                              Name:
                              Commission No.:
                              Expiration Date:

# EXHIBIT "D"

## ASSIGNMENT AND ASSUMPTION
## OF INTEREST IN EXFREIGHT OF FLORIDA, LLC

KNOW ALL MEN BY THESE PRESENTS that the undersigned, IPS WORLDWIDE, LLC (the "Assignor"), hereby assigns, transfers and conveys to EXFREIGHT ZETA, LLC (the "Assignee"), all of Assignor's rights, title and interest as a member in EXFREIGHT OF FLORIDA, LLC (the "Assigned Interest"), consistent with the dates set forth in the parties' settlement agreement.

Assignor further and specifically represents and warrants that it has no further ownership interest in EXFREIGHT OF FLORIDA, LLC other than the Assigned Interest, and that Assignor releases all rights it has and does claim to be held as a member, managing member, director, officer, employee or other agent of, in and through all EXFREIGHT OF FLORIDA, LLC.

Assignee, who is a member of EXFREIGHT OF FLORIDA, LLC, hereby agrees to accept Assignor's interest, if any, and further agrees to assume all obligations under the Articles of Organization and the Operating Agreement, if any, of EXFREIGHT OF FLORIDA, LLC as to the membership interest received from Assignor.

The parties agree that this Assignment and Assumption of Interest is hereby assigned, transferred and conveyed from Assignor to Assignee for One Dollar ($1.00) and other good and valuable consideration set forth herein, receipt of which is acknowledged by Assignor by signing below.

Each party hereby acknowledges and agrees that the requisite notice of Assignor's desire to sell or transfer its ownership interest, the requisite written offer by Assignee to buy the Assignor's ownership interest, and the acceptance of that offer by the Assignor, as provided for

under Florida and any other applicable laws, has been properly waived or fulfilled with respect to this single transaction.

IN WITNESS WHEREOF, this Assignment and Assumption of Interest has been duly executed by the parties hereto as of the _____ day of _____, 2020

**ASSIGNOR:**                                         **ASSIGNEE:**


_____          _____
ALEX D. MOGLIA,                                     CHARLES MARRALE
as the Chapter 11 Trustee of
IPS WORLDWIDE, LLC


STATE OF FLORIDA

COUNTY OF _____

    This instrument was acknowledged before me this _____ day of _____, 2020, by ALEX D. MOGLIA, as the Chapter 11 Trustee of IPS WORLDWIDE, LLC, Member, who (  ) is personally known to me or who (  ) has produced a driver's license as identification.


                              _____
                              NOTARY PUBLIC
                              Name:
                              Commission No.:
                              Expiration Date:

STATE OF FLORIDA

COUNTY OF _____

    This instrument was acknowledged before me this _____ day of _____, 2020, by CHARLES MARRALE, who ( ) is personally known to me or who ( ) has produced a driver's license as identification.


                                        _____
                                        NOTARY PUBLIC
                                        Name:
                                        Commission No.:
                                          Expiration Date:

# EXHIBIT "E"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

IPS WORLDWIDE, LLC,

                Debtor.

_____/

ALEX D. MOGLIA, TRUSTEE,

                Plaintiff,

vs.

EXFREIGHT OF FLORIDA, LLC, a Florida
limited liability company, EXFREIGHT
ZETA, LLC, a Florida limited liability
company, DACACO HOLDINGS, LLC, and
Florida limited liability company, and
STEPHEN HUNTLEY, an individual,

                Defendants.

_____/

CASE NO. 6:19-bk-00511-KSJ

CHAPTER 11

Adv. Pro. No. 20-ap

MUTUAL RELEASE BY AND BETWEEN
ALEX D. MOGLIA, AS THE CHAPTER 11 TRUSTEE FOR
IPS WORLDWIDE, LLC, EXFREIGHT ZETA, LLC, AND CHARLES MARRALE

On January 25, 2019 (the "Petition Date"), IPS Worldwide, LLC (the "Debtor") filed its

petition for relief under Chapter 11 of the Bankruptcy Code. On April 5, 2019, the Court entered

an order granting the motions of the U.S. Trustee (Doc. No. 227) and creditor, Stanley Black &

Decker, Inc. (Doc. No. 290) for the appointment of a Chapter 11 trustee in the Debtor's bankruptcy

case. That same day, Alex D. Moglia ("Moglia") was appointed to serve as Chapter 11 Trustee for

the Debtor (Doc. No. 291).

On April 15, 2019, Exfreight Zeta, LLC ("Zeta") commenced an adversary proceeding against the Trustee, DACACO Holdings, LLC ("DACACO"), Exfreight of Florida, LLC ("EOF"), and Steven Huntley ("Huntley") requesting a declaratory judgment regarding the membership interests in EOF and a determination as to whether transfers made to Zeta were recoverable by the Trustee, as well as an injunction as to information on the Debtor's webpage (the "Zeta Adversary Proceeding").

On April 24, 2019, Zeta filed a Motion to Determine that the Barton Doctrine does not apply to the Zeta Adversary Proceeding (the "Barton Doctrine Motion") (Doc. No. 341). On May 1, 2019, the Court entered a scheduling order regarding the Barton Doctrine Motion ("Scheduling Order") (Doc. No. 367).

On December 4, 2019, Moglia, the Debtor and Zeta entered into a settlement agreement (the "Settlement") to expedite the resolution of the issues raised in the Zeta Adversary Proceeding and the Barton Doctrine Motion. The terms of the Settlement are set forth in the Joint Motion by Chapter 11 Trustee, Alex D. Moglia and Exfreight Zeta, LLC to Approve Settlement Agreement Pursuant to Bankruptcy Rule 9019, filed with the Court on December 4, 2019 (Doc. No. ).

As such, pursuant to the Settlement and contingent only upon Bankruptcy Court approval of the Settlement and fulfillment of the obligations under the Settlement, Moglia and his affiliates, agents, successors, and assigns, or any one claiming under it, or any of them, and the Chapter 11 estate of IPS, on the one hand (collectively, "IPS"), and Zeta and Charles Marrale (collectively, the "Zeta Parties") and their successors, or any one claiming under it, or any of them, on the other hand, do hereby release, remise and forever discharge the other from any and all claims, demands, actions, causes of action, rights of action, debts, covenants, contracts, agreements, representations, judgments, executions, costs, expenses, obligations, or liabilities of any nature whatsoever, known

or unknown, at law or in equity or by statute, that any of them now have or that may subsequently accrue to any one of them, including but not limited to those that are based upon, arise out of, or in any way relate to the IPS Adversary Proceeding. This Settlement Agreement, including this mutual release, shall not in any way release, impair, reduce or otherwise affect any complaints, whether now pending or hereafter filed, by IPS against any person or entity other than the Zeta Parties.

**IN WITNESS WHEREOF**, the parties hereto have duly executed the Settlement Agreement as of and effective the date first written above.

**CHARLES MARRALE**, an individual

By:

**EXFREIGHT ZETA, LLC**

By:

**ALEX D. MOGLIA**, as the Chapter 11
Trustee of IPS Worldwide, LLC

By: